UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

SEVENSON ENVIRONMENTAL SERVICES, INC.

                        Plaintiff

         vs.

GORDON D. MCDONALD, Individually and d/b/a
JMK LANDSCAPING
and GENERAL MONITORING
and GENERAL TANK
and GENERAL CHEMICAL, etc.,
GMEC, INC., a/k/a GENERAL MONITORING AND
ENVIRONMENTAL CONTROL, INC.,
PATRICIA MCDONALD,
FLOWERS BY SWEETENS, INC.,
MATTHEW MCDONALD,
KEVIN MCDONALD, and
THOMAS MCDONALD,
BENNETT ENVIRONMENTAL, INC.,
JOHN BENNETT,
ROBERT GRIFFITHS,
DCP TECHNICAL SERVICES,
JMJ ENVIRONMENTAL, INC.,
JOHN DRIMAK, JR.,
ELITE LANDSCAPING, INC.,
FREDERICK A. LANDGRABER,
RAY ANGELINI, INC.,
RAY ANGELINI,
CHRIS TRANCHINA,
NATIONAL INDUSTRIAL SUPPLY, LLC,
VICTOR BOSKI,

                    Defendants.

_____

**SECOND
AMERICAN COMPLAINT
WITH JURY DEMAND**


Civ. No. 08-01386 RMB-AMD

## INTRODUCTION

Sevenson Environmental Services, Inc. ("Sevenson"), by its attorneys

Phelan, Pettit & Biedrzycki, LLC, complains of the defendants as follows:

1.      This case involves thefts, embezzlements and fraud by one of

Sevenson's long-time, trusted employees.  Defendant Gordon D. McDonald, employed

by Sevenson in a supervisory position as a project manager since 1992, schemed to steal

from Sevenson beginning at least as early as 2001.  The schemes included, among other

things, padding expense reports and outright conversion of checks payable to Sevenson.

2.      This case also involves unauthorized payments to Gordon D.

McDonald by subcontractors at private and federal environmental remediation projects.

Sevenson relied upon Gordon D. McDonald, its project manager, to supervise the

projects and its subcontracts in a faithful and honest manner, but Gordon D. McDonald,

with the assistance of others, and to the personal benefit of himself, family members

and others, engaged in a scheme to defraud Sevenson, with the active participation and

assistance of the subcontractors and their agents, who also benefited thereby.  The

schemes were carefully concealed from Sevenson.

## PARTIES

3.      Sevenson is a business corporation created under the laws of the

State of New York.  Its principal place of business is located at 2749 Lockport Road,

Niagara Falls, New York.  It is qualified to do business in the State of New Jersey.

Sevenson provides a comprehensive range of services for the remediation and cleanup of sites and facilities contaminated by hazardous materials.

4.      Defendant Gordon D. McDonald resides at 4478 Venicean Road, Sea Isle City, New Jersey (the "Sea Isle Property") (this defendant is referred to below simply as "McDonald," not to be confused with other members of McDonald's family who assisted in or participated with him in his fraud). From time to time, McDonald uses the names "JMK Landscaping," "General Monitoring," "General Tank," "General Chemical," and variations thereon (the "McDonald Entities"), as part of his business practices or fraudulent schemes.

5.      Defendant Patricia McDonald resides at the Sea Isle Property with McDonald.  She has been McDonald's wife at all times relevant and is united in financial interest with him by that fact and in the course of their joint business practices. Patricia McDonald owns the Sea Isle Property jointly with McDonald.

6.      Defendant GMEC Corp. is a corporation created under the laws of the State of New Jersey ("GMEC").   From time to time, GMEC also is known as "General Monitoring and Environmental Control, Inc." or as "General Monitoring." McDonald is an officer, director and control person of GMEC.  GMEC has an office at 4478 Venicean Road, Sea Isle City, New Jersey.

7.      Defendant Flowers by Sweetens, Inc. is a corporation created under the laws of New Jersey ("FBS").  FBS has an office at 530 North Broad Street, Woodbury, New Jersey.  FBS was and is in the business of retail sale of flowers, among other things.

Patricia McDonald, at all times relevant, was an officer, director and control person of or otherwise had an interest in FBS.

8.      Defendant Mathew McDonald resides at 706 S. Darien St., Philadelphia, Pennsylvania.  As set forth below, he has transacted business in the  State of New Jersey.  Upon information and belief, Mathew McDonald is the son of McDonald and Patricia McDonald.

9.      Defendant Kevin McDonald resides at 55 N. 2nd Street, Apt. A, Philadelphia, Pennsylvania.  As set forth below, he has transacted business in the State of New Jersey.  Upon information and belief, Kevin McDonald is the son of McDonald and Patricia McDonald.

10.     Defendant Thomas McDonald resides at 530 Sharp Avenue, Berlin, New Jersey.  Upon information and belief, Thomas McDonald is McDonald's brother.

11.     Defendant Bennett Environmental, Inc. is a corporation created under the laws of Canada ("BEI").  Upon information and belief, its principal office is located at 1540 Cornwall Road, Suite 208 Oakville, Ontario L6J 7W5 in Canada.  As set forth below, BEI has transacted business in the  State of New Jersey.

12.     Defendant John Bennett is a citizen of Canada ("Bennett").  Upon information and belief, he resides at 1138 West Pender Street, Vancouver, British Columbia in Canada.  At all times relevant, Bennett was an officer and director, and the chief executive officer, of BEI.  As set forth below, he has transacted business in the State of New Jersey.

13.     Defendant Robert Griffiths is a citizen of Canada ("Griffiths").

Upon information and belief, he resides at 2288 Marstand Avenue, Unit #107,

Vancouver, British Columbia in Canada. At all times relevant, Griffiths was an officer of

BEI and had primary responsibility for BEI's subcontracts with Sevenson as described

below.  As set forth below, he has transacted business in the  State of New Jersey.

14.     Upon information and belief, Defendant DCP Technical Services is

a corporation or other entity created or existing under the laws of the Province of

Ontario, Canada ("DCP").  Upon information and belief, DCP has an office at 268

Lakeshore East, Suite 425, Oakville, Ontario in Canada.  As set forth below, DCP has

transacted business in the  State of New Jersey.  Upon information and belief, Griffiths

is the owner, control person or agent of DCP, or uses the name DCP for his business

affairs.

15.     Defendant JMJ Environmental, Inc. is a corporation created under

the laws of the State of New Jersey ("JMJ").  JMJ has an office at 1460 Chews Landing

Road, Laurel Springs, New Jersey.

16.     Defendant  John Drimak, Jr. is a citizen of the State of New Jersey

("Drimak"). Upon information and belief, Drimak resides at 7 Dorado Road, Laurel

Springs, New Jersey. At all relevant times, Drimak controlled or was the agent of JMJ.

17.     Defendant Elite Landscaping, Inc. is a corporation created under

the laws of the State of New Jersey ("Elite").  Elite has an office at 1982 Washington

Road, PO Box 309, Martinsville, New Jersey.

18.     Defendant Frederick A. Landgraber is a citizen of the State of New Jersey ("Landgraber").  Landgraber resides at 1523 Sage Street, South Plainfield, New Jersey.  At all relevant times, Landgraber controlled or was the agent of Elite.

19.     Defendant Ray Angelini, Inc. is a corporation created under the laws of the State of New Jersey ("Angelini").  Angelini has an office at 105 Barnsboro Blackwood Road, PO Box 432 Sewell, New Jersey.

20.     Defendant Ray Angelini is a citizen of the State of New Jersey. Upon information and belief, Ray Angelini has an office at 105 Barnsboro Blackwood Road, PO Box 432 Sewell, New Jersey. At all relevant times, Ray Angelini controlled or was the agent of Angelini.

21.     Defendant Chris Tranchina is a citizen of the State of New Jersey ("Tranchina").  Upon information and belief, Tranchina resides at 103 Sylvan Terrace, Glassboro, New Jersey. At all relevant times, Tranchina was an employee and agent of Angelini.

22.     Defendant National Industrial Supply, LLC is a limited liability company created under the laws of the State of New Jersey ("NIS").  NIS has an office at 113 Lincoln Boulevard, PO Box 545, Middlesex, New Jersey.

23.     Defendant Victor Boski is a citizen of the State of New Jersey ("Boski").  Upon information and belief, Boski resides at 45 Bissell Road, Lebanon, New Jersey and controls or is the agent of NIS.

## JURISDICTION

24.     The Court has jurisdiction under 28 U.S.C. § 1332 because of the diversity of citizenship of the parties.  The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00.

25.     The Court has jurisdiction over the individual defendants who reside outside of the State of New Jersey because each of them came into the State of New Jersey in furtherance of the acts complained of below, or committed acts which were part of a tort which occurred in the State of New Jersey.  Jurisdiction is proper under New Jersey Civil Practice Rule 4:4-4.

## BACKGROUND

26.     As part of the remediation and cleanup of sites and facilities contaminated by hazardous materials, Sevenson enters into contracts with the owner or government agency having responsibility for the site or facility.

27.     Sevenson employed McDonald to serve as the project manager at remediation sites where Sevenson had contracts.  McDonald was employed by Sevenson from in or about 1992 through October, 2007.

28.     At or subsequent to the time that Sevenson hired him, McDonald disclosed his ownership of GMEC and agreed with Sevenson that GMEC would not subcontract at any site where Sevenson had a contract without full disclosure and the express permission of Sevenson.

29.     As its employee, McDonald owed a duty to Sevenson of undivided loyalty, good faith and full disclosure in his business dealings.  At all relevant times until his dismissal in October 2007, there existed a principal-agent and fiduciary relationship between Sevenson and McDonald.

30.     As further described below, Sevenson employed McDonald as its project manager at, among others, the Diamond Alkali and Federal Creosote projects in the State of New Jersey, where he administered Sevenson's subcontracts with BEI, JMJ, Elite, Angelini and NIS (together, the "Subcontractors").

31.     Patricia McDonald is and has been at all times relevant fully aware of McDonald's employment with Sevenson, and the duties that McDonald owed to Sevenson.

32.     Likewise, Matthew McDonald, Kevin McDonald and Thomas McDonald, all of whom are and have been affiliated with McDonald as close family members, are and have been at all times relevant, fully aware of McDonald's employment with Sevenson, and the duties that McDonald owed to Sevenson.

**The Federal Creosote Site**

33.     In or about December 2000, Sevenson was awarded a cost reimbursable contract by the Army Corp of Engineers of the United States of America (the "ACE") to clean up a contaminated site in Manville, New Jersey; the site is commonly referred to as the "Federal Creosote Site."

34.   Environmental remediation work at the Federal Creosote Site is under the control or supervision of the ACE.

35.   Following the contract award by the ACE, Sevenson appointed McDonald as its project manager at the Federal Creosote Site.  McDonald served as Sevenson's project manager at the Federal Creosote Site at all times relevant to the allegations that follow.

36.   Sevenson entrusted and relied on McDonald to oversee people working at the Federal Creosote Site, to review subcontract bids and proposals, and to recommend the selection of subcontractors to Sevenson, and to secure consent to Sevenson's selection of subcontractors from the ACE.


**The Diamond Alkali Site**

37.   Prior to 1999, Sevenson received a cost reimbursable contract from Tierra Solutions, Ltd. ("Tierra") for the clean-up of a site controlled by that company located at Lister Avenue, Newark, New Jersey; the site is commonly referred to as the "Diamond Alkali Site."

38.   In or about January, 1999, Sevenson appointed McDonald as its project manager at the Diamond Alkali Site.

39.   Sevenson entrusted and relied on McDonald to oversee people working at the Diamond Alkali Site, to review subcontract bids and proposals, and to recommend the selection of subcontractors to Sevenson.

40.     Also as part of his duties, McDonald was entrusted by Sevenson to issue checks on a Sevenson bank account in New Jersey for Sevenson's expenses at the Diamond Alkali Site (the "DA Account").  McDonald prepared submissions to Sevenson to justify the expenses on a "Batch Report" (the "DA Batch Report").

41.     The DA Batch Report included copies of the receipts or other evidence of the expenses, and was submitted to Sevenson's offices in Niagara Falls, New York.  In reliance upon the DA Batch Reports submitted by McDonald, the DA Account was replenished by Sevenson.

42.     Sevenson paid its employees at the Diamond Alkali Site a "per diem" amount for their daily expenses.  Sevenson entrusted McDonald with the task of overseeing and distributing the per diem payments, which McDonald paid to the employees in cash.

**Conversion**

43.     McDonald was responsible to account to Sevenson for accounts receivable in his capacity as Project Manager at the Diamond Alkali Site.

44.     On or after September 9, 2004, Tierra sent to Sevenson's field office at the Diamond Alkali Site its Check No. 206543, payable to Sevenson in the amount of $28,576.98 (the "Tierra Check"), representing payment for services performed by Sevenson.

45.     Although McDonald received the Tierra Check in his capacity as Sevenson's Project Manager, he did not account to Sevenson for the Tierra Check.

46.     On the contrary, McDonald retained, wrongfully endorsed and, on or about October 21, 2004, deposited or caused to be deposited the Tierra Check in a GMEC bank account.

47.     McDonald fraudulently concealed from Sevenson the existence of the Tierra Check and his receipt and disposition thereof, and, upon subsequent inquiry from his employer, affirmatively misrepresented to Sevenson that the amount at issue was required to be  -- and was -- written off.

48.     Sevenson did not approve of this scheme and had no knowledge of this conversion, which was only discovered in November 2007.


**The FBS Diversions**

49.     FBS, as part of its business operations, ordered flowers wholesale from Delaware Valley Wholesale Florist for the purpose of retail sale.

50.     Patricia McDonald had control over the accounts payable of FBS to Delaware Valley Wholesale Florist.  From time to time, Patricia McDonald arranged for McDonald to make payment by issuing checks drawn on the DA Account to pay accounts owing by FBS to Delaware Valley Wholesale Florist, with no benefit to Sevenson.

51.     By way of example and not limitation, on or about August 21, 2001, after diverting Sevenson funds into the GMEC account, McDonald arranged for payment to Delaware Valley Wholesale Florist on account of FBS.  By doing so, McDonald arranged for Patricia McDonald's business to reduce its liabilities and

increase its profits, which profits were afterwards directed, upon information and belief, to the joint benefit of McDonald and Patricia McDonald.

52.     From time to time, McDonald repeated the scheme of taking money from Sevenson and paying accounts owing by FBS to Delaware Valley Wholesale Florist.

53.     Sevenson did not approve of this scheme, which was concealed from it and had no benefit to Sevenson.  This scheme was not discovered until February 2008.

## Further Schemes to Defraud at the Diamond Alkali Site

54.     In or about February, 2001, McDonald violated his fiduciary duty to Sevenson and broke his agreement with Sevenson concerning the activities of GMEC, by preparing false records indicating that a company he identified as "General Monitoring" had provided goods or services at the Diamond Alkali Site, with a value of $3,391.00.

55.     McDonald entered the expense for General Monitoring in the DA Batch Report and issued a check on the DA Account for that amount on or about February 16, 2001.

56.     On or about March 21, 2001, McDonald deposited the check in a GMEC bank account.

57.     At no time did McDonald identify "General Monitoring" with GMEC to Sevenson, or disclose his interest in General Monitoring, but concealed that fact from Sevenson.

58.     Likewise, in or about November 2001, McDonald entered an expense payable to "JMK Landscaping" into the DA Batch Report, claiming that goods and services in the amount of $3,634.00 were provided by that company.

59.     On or about November 9, 2001, McDonald issued a check on the DA Account for the amount of $3,634.00 payable to JMK Landscaping, and then deposited that check in a GMEC bank account.

60.     At no time did McDonald disclose to Sevenson that he had an interest in JMK Landscaping, but he concealed that fact from Sevenson.

61.     In fact, JMK Landscaping did not provide goods or services at the Diamond Alkali Site for the benefit of Sevenson.

62.     From time to time, McDonald wrote checks to "Cash" on the DA Account and deposited them in the GMEC Account while falsifying entries in the DA Batch Report with no benefit to Sevenson.

63.     These were not isolated events, but, upon information and belief, from time to time afterwards, McDonald used the names General Monitoring, JMK Landscaping and others, or checks payable to cash, as part of his scheme to divert money from Sevenson to his personal purposes with no benefit to Sevenson.

64.     From time to time, McDonald paid per diem expenses to employees at the Diamond Alkali Site, but would add a sum to the total per diem amounts, then cash a check for the total, distribute cash to the employees, and retain for himself the sum he had added.

65.     Sevenson did not approve of these schemes, which were concealed from it and had no benefit to Sevenson, but damaged Sevenson in the amounts which McDonald took for himself and his affiliates.  This scheme was not discovered until February 2008.

**Participation of other Defendants in Scheme to Defraud**

66.     From time to time, Mathew McDonald, Kevin McDonald and Thomas McDonald received funds from or paid funds to GMEC as part of the scheme to hide McDonald's nefarious acts, and used the funds to benefit themselves or to benefit McDonald and thus participated in McDonald's scheme to defraud Sevenson or were unjustly enriched thereby.

67.     From time to time, Patricia McDonald received money from GMEC and used it to benefit herself or to benefit McDonald, or both of them jointly, and thus participated in McDonald's scheme to defraud Sevenson or was unjustly enriched thereby.

68.     From time to time, DCP received money from GMEC and used it to benefit itself and Griffiths as described further below, or to benefit McDonald, and thus participated in the scheme or was unjustly enriched thereby.

69.     Sevenson did not approve of these schemes, which was concealed from it and had no benefit to Sevenson.  This scheme was not discovered until February 2008.

**Subcontracts and Unauthorized Payments**

70.     Sevenson issued purchase and change orders to the Subcontractors in the ordinary course of business for work they performed at any Sevenson site.

71.     Sevenson's purchase and change orders, which the Subcontractors as "Vendors" signed or accepted in each instance, included the following terms to which they agreed:

>    i.   "Vendor agrees to comply with all laws, rules, regulations, standards and ordinances of the federal, state and local authorities applicable to Vendor's work," and

>    ii.  "This contract shall be governed and construed under the laws of the State of New York."

72.     Sevenson required each Subcontractor having a subcontract for over $50,000.00 at the Federal Creosote Project to sign a "Statement and Acknowledgement" which incorporated "Subcontractors" clauses from the Federal Acquisition Regulations ("FAR").  FAR prohibits subcontractors from paying or providing kickbacks to individuals or the prime contractor, among other things.

73.     From time to time, McDonald procured unauthorized payments from the Subcontractors at the Diamond Alkali Site and the Federal Creosote Site in return for favorable treatment.  Among those participating in the unauthorized payment scheme and thus obtaining subcontracts from Sevenson were the Subcontractors, and individuals associated with them.

74.     Generally, McDonald arranged the unauthorized payments by promising the Subcontractors that he would arrange for them to have their bids or

proposals approved by Sevenson, and that he would treat them favorably on-site, in exchange for payments by the Subcontractors to GMEC or the McDonald Entities.

75.    Neither GMEC nor the McDonald Entities, however, provided services or materials for the payments received from the Subcontractors.

76.    At all relevant times, McDonald dominated GMEC, operated it as his alter ego, and used it as a conduit of funds for his personal benefit.

77.    By way of example and not limitation, BEI submitted proposals or bids for soil transportation and disposal at the Federal Creosote Site.  BEI agreed with McDonald that BEI would pay money to GMEC in return for favorable treatment of BEI in its bids, proposals and performance.  Pursuant to the scheme, McDonald acted to gain Sevenson's approval of BEI's proposals or bids, and gave BEI favorable treatment in its performance.  BEI correspondingly made unauthorized payments to GMEC.

78.    The scheme between BEI and McDonald existed at least during the years 2002 through 2004, during which BEI's payments to GMEC exceeded one million dollars.

79.    Thomas McDonald assisted McDonald by, among other things, using his home address as the business address of GMEC for the purpose of McDonald's receipt of unauthorized payments, in return for which Thomas McDonald received proceeds from the unauthorized payments.

80.    Also by way of example and not limitation, Angelini submitted bids or proposals to Sevenson for work at the Diamond Alkali Site or the Federal Creosote Site which included amounts for payment to GMEC.  Angelini's invoices

included the unauthorized payments.  Pursuant to the scheme, Angelini made

payments to GMEC as agreed with McDonald.

81.    The scheme between Angelini and McDonald included at least the

years 2001 through 2005, during which Angelini's payments to GMEC exceeded one

hundred thirty-eight thousand dollars.

82.    In a similar scheme, JMJ paid more than one hundred twenty

thousand dollars in unauthorized payments to GMEC from 2002 through 2005.

83.    In a similar scheme, Elite paid more than thirty thousand dollars in

unauthorized payments to GMEC from 2002 through 2004.

84.    In a similar scheme, NIS paid more than eleven thousand dollars in

unauthorized payments to GMEC from 2002 through 2004.

85.    As part of the scheme, McDonald and the Subcontractors prepared

and submitted false papers to Sevenson.

86.     McDonald and the Subcontractors also submitted papers for

review by, or which they knew would be reviewed by, Tierra or the ACE which

contained materially false statements, or which omitted material facts necessary to

make the statements truthful, thus furthering and covering-up their fraudulent schemes.

87.    Sevenson did not approve or have knowledge of this scheme,

which was carefully concealed from it by those involved and had no benefit to

Sevenson.  The existence of the scheme was not discovered by Sevenson until October

2007, and the details of the scheme were not discovered until February 2008.

**Purchase of Home by McDonald and Patricia McDonald**

88.     As a result of the continuous schemes, frauds, breaches of fiduciary duty, and breaches of contract, by McDonald with respect to Sevenson, McDonald and Patricia McDonald amassed a large amount of funds for use to purchase the Sea Isle Property jointly.

89.     McDonald and Patricia McDonald persuaded Sevenson to advance them more funds as a "Bridge Loan" which they used with the unauthorized payments described above, to purchase the Sea Isle Property in or about June, 2003.

90.     Sevenson did not approve of this scheme to use its money to purchase the Sea Isle Property, which was concealed from and had no benefit to Sevenson.  This scheme was not discovered until February 2008.


**First Count**
**Against McDonald**
(Conversion)

91.     Plaintiff repeats and realleges all of the above allegations.

92.     In or around September/October 2004, McDonald came into possession of the Tierra Check by virtue of his fiduciary status as Sevenson's Project Manager for the Diamond Alkali Site.

93.     On or about October 21, 2004, McDonald wrongfully and fraudulently converted the Tierra Check to his own use, dispossessing Sevenson thereof, by retaining, wrongfully endorsing and depositing the Tierra Check in the GMEC bank account.

94.     Upon information and belief, McDonald employed the same strategy in converting additional, as yet unidentified checks payable to Sevenson.

95.     McDonald's conversion has caused substantial damages to Sevenson, including but not limited to the loss of the Tierra Check in the amount of at least $28,576.98.

**WHEREFORE**, plaintiff demands Judgment against McDonald for his conversion of the Tierra Check in the liquidated amount of $28,576.98, plus interest thereon from the date of conversion.

**<u>Second Count</u>**
**Against McDonald**
(Breach of Fiduciary Duty)

96.     Plaintiff repeats and realleges all of the above allegations.

97.     At all relevant times, Sevenson and McDonald had a principal-agent and fiduciary relationship.

98.     As Sevenson's agent, McDonald owed to Sevenson a fiduciary duty, among others, of undivided loyalty to act in Sevenson's interest.

99.     As Sevenson's agent and fiduciary, McDonald owed to Sevenson a duty to account for the DA Account, the DA Batch Report, and all accounts receivable on projects, including but not limited to the Diamond Alkali Site.

100.    In violation of his fiduciary duty, McDonald did not account to Sevenson for all accounts receivable on the Diamond Alkali Site.

101.    On the contrary, McDonald converted one or more checks payable to Sevenson by retaining, wrongfully endorsing and depositing such checks in a bank account, then fraudulently concealed his actions from Sevenson.

102.    McDonald also falsified entries to the DA Batch Report by which he reported expenses at the Diamond Alkali Site involving payments to "cash" or to fictitious companies known as JMK Landscaping or General Monitoring, or variations of those names, upon which he issued checks to those companies from Sevenson's account, or simply deposited the check, with no work or materials to benefit the Diamond Alkali Site or Sevenson.

103.    McDonald's breach of fiduciary duty has caused substantial damages to Sevenson, including but not limited to the loss of payment from a third party in the amount of $28,576.98 and the funds diverted by him from plaintiff to his personal use.

104.    McDonald acted contrary to Sevenson's interest and solicited and accepted unauthorized payments through GMEC and the McDonald Entities in violation of his duties to Sevenson.

105.    Such actions were concealed from Sevenson and Sevenson received no benefit from them.

106.    McDonald's breach of fiduciary duty has caused substantial damages to Sevenson.

107.   Any receipt of money or acceptance of gifts by McDonald from any third person which was connected in any way to McDonald's work for Sevenson is or was presumed in law to be for Sevenson.

108.   Further, McDonald's conduct renders him a faithless servant and requires him to forfeit and repay to Sevenson all compensation paid to him or accrued for his benefit since his first disloyal act.

**WHEREFORE**, Sevenson demands Judgment against McDonald for his breach of fiduciary duty and faithless conduct in the amount of the unauthorized payments and his compensation.

## Third Count
### Against All Defendants
(Equitable Accounting)

109.   Plaintiff repeats and realleges all of the above allegations.

110.   At all relevant times until October 2007, there existed a principal-agent and fiduciary relationship between Sevenson and McDonald.

111.   The breach of his fiduciary duty by McDonald included the transfer of funds from Sevenson to GMEC, following which funds were disbursed by GMEC to unjustly enrich the other defendants.

112.   In his capacity as Sevenson's agent and fiduciary, McDonald was responsible to account to Sevenson for accounts receivable on projects, including but not limited to the Diamond Alkali Site, where McDonald was Project Manager.

113.     In violation of his fiduciary duty, McDonald failed to account to Sevenson for the Tierra Check and, upon information and belief, for other accounts receivable as well.

114.     In addition, McDonald issued numerous checks on the DA Account to "Cash," and to the McDonald Entities, with no benefit to Sevenson.

115.     Information concerning the McDonald Entities and the additional accounts receivable for which McDonald failed to account to Sevenson is exclusively in the possession, custody or control of McDonald.

116.     After depositing checks in the GMEC bank account, McDonald thereafter transferred funds directly to or for the benefit of defendants Patricia McDonald, Matthew McDonald, Kevin McDonald, Thomas McDonald, DCP and FBS.

117.     The Subcontractors made unauthorized payments to McDonald through McDonald's affiliate GMEC or the McDonald Entities while having subcontracts at the Diamond Alkali Site or the Federal Creosote Site.

118.     BEI, which had a subcontract only at the Federal Creosote Site, paid the following amounts to GMEC on or about the following dates:

| Date | Amount |
|------|--------|
| 6/14/2002 | $ 58,735.00 |
| 8/19/2002 | $ 33,150.00 |
| 11/25/2002 | $ 41,395.00 |
| 1/31/2003 | $ 80,815.00 |
| 3/3/2003 | $ 84,215.00 |
| 4/16/2003 | $ 75,890.00 |
| 6/11/2003 | $ 177,000.00 |
| 7/21/2003 | $ 76,095.00 |
| 8/26/2003 | $ 249,910.00 |
| 10/24/2003 | $ 79,850.00 |
| 2/17/2004 | $ 79,615.00 |
| 4/19/2004 | $ 77,570.00 |
| **Total:** | **$ 1,114,240.00** |

119.    BEI also paid other value in the form of cases of wine, wine coolers, plasma television sets, medicine, and other gifts.  These payments and gifts, and any others made to McDonald or his affiliates, are referred to below as the "BEI Payments."

120.    Angelini, which had subcontracts at both the Diamond Alkali Site and the Federal Creosote Site, paid the following amounts to GMEC on or about the following dates:

| Date | Amount |
|------|--------|
| 8/13/2001 | $ 25,920.00 |
| 3/18/2003 | $ 21,801.72 |
| 8/15/2003 | $ 33,785.00 |
| 4/22/2005 | $ 56,715.00 |
| **Total:** | **$ 138,221.72** |

These payments, and any others made to McDonald or his affiliates, are referred to below as the "Angelini Payments."

121.    JMJ, which had subcontracts at both the Diamond Alkali Site and the Federal Creosote Site, and other sites as well, paid the following amounts to GMEC on or about the following dates:

| Date | Amount |
|------|--------|
| 8/2/2002 | $  33,716.25 |
| 2/20/2003 | $    8,000.00 |
| 3/28/2003 | $    8,000.00 |
| 10/21/2004 | $  30,000.00 |
| 10/21/2004 | $  22,490.18 |
| 2/22/2005 | $  18,360.00 |
| **Total:** | **$  120,566.43** |

These payments, and any others made to McDonald or his affiliates, are referred to below as the "JMJ Payments."

122.    Elite, which had subcontracts at both the Diamond Alkali Site and the Federal Creosote Site, paid the following amounts to GMEC on or about the following dates:

| Date | Amount |
|------|--------|
| 12/24/2002 | $   4,020.00 |
| 8/25/2004 | $ 13,000.00 |
| 9/1/2004 | $ 13,000.00 |
| **Total:** | **$ 30,020.00** |

These payments, and any others made to McDonald or his affiliates, are referred to below as the "Elite Payments."

123.    NIS, which had subcontracts at both the Diamond Alkali Site and the Federal Creosote Site and other sites as well, paid the following amounts to GMEC on or about the following dates:

| Date | Amount |
|------|--------|
| 9/6/2002 | $2,980.00 |
| 12/24/2002 | $1,375.00 |
| 9/4/2003 | $2,275.00 |
| 7/1/2004 | $4,650.00 |
| **TOTAL** | **11,280.00** |

These payments, and any others made to McDonald or his affiliates, are referred to below as the "NIS Payments."

124.    Information concerning payments to GMEC, the McDonald Entities, McDonald himself or other McDonald affiliates for which McDonald failed to account to Sevenson is almost exclusively in the possession, custody or control of McDonald and the other defendants.

125.    The efforts by McDonald and the other defendants to conceal the transfer of funds from the Subcontractors to McDonald and others involved multiple bank accounts and transfers.  The transfers of funds among the accounts are complex in nature and involve fraud by the defendants.

**WHEREFORE**, Sevenson demands judgment enjoining and compelling the defendants to account to Sevenson for all funds transferred as part of the schemes alleged above.

**Fourth Count**
**Against McDonald**
(Fraud)

126.    Plaintiff repeats and realleges all of the above allegations.

127.    At all relevant times until November 2007, there existed a principal-agent and fiduciary relationship between Sevenson and McDonald.

128.    Notwithstanding his status as Sevenson's fiduciary, McDonald fraudulently concealed from Sevenson the existence of the Tierra Check and his receipt and disposition thereof, and, upon subsequent inquiry from his employer, affirmatively misrepresented to Sevenson that the amount at issue was required to be -- and was -- written off.

129.    Upon information and belief, McDonald also fraudulently concealed from Sevenson and/or made misrepresentations to Sevenson concerning additional checks payable to Sevenson, as well as concerning entries of the DA Batch Report and concerning checks issued on the DA Account as set forth above.

130.    Sevenson reasonably relied upon McDonald's misrepresentations and omissions.

131.    McDonald's fraud has caused substantial damages to Sevenson, including but not limited to the loss of payment from a third party in the amount of at least $28,576.98 and the taking of other funds from plaintiff.

**WHEREFORE**, Sevenson demands Judgment against McDonald for fraud.

**Fifth Count**
**Against Defendants Bennett, Griffiths, DCP,**
**BEI (the "BEI Defendants"), Thomas McDonald and McDonald**
(Fraud)

132.    Plaintiff repeats and realleges all of the above allegations.

133.    Sevenson originally administered the bids and proposals for soil transportation and disposal at the Federal Creosote Site at its headquarter offices in Niagara Falls, New York.

134.    Sevenson evaluated and administered the Phase I subcontract for soil transportation and disposal at the Federal Creosote Site at its Niagara Falls, New York offices in 2000-2001.  Sevenson awarded the subcontract to BEI after review of competitively solicited proposals.

135.    Thereafter, the ACE insisted that administration of OU1 Phase II and later work under its contract with Sevenson at the Federal Creosote Project be administered on-site in Manville, New Jersey.

136.    In early 2002, McDonald, the project manager for Sevenson who was on-site at the Federal Creosote Project in Manville, New Jersey, schemed with the BEI Defendants to defraud Sevenson by arranging unauthorized payments to McDonald and including the cost of the unauthorized payments in the prices for soil transportation and disposal.

137.    At some point in time, McDonald agreed with Griffiths and possibly others that, upon his receipt of unauthorized payments from the BEI Defendants, then he would pay a portion of such funds to DCP.

138.    McDonald, as project manager at the Federal Creosote Project, had control over the Request for Proposals ("RFP") process for the Phase II subcontract for soil transportation and disposal.

139.    As part of the contract between them, Sevenson was required to obtain the consent of the ACE before making subcontract awards.

140.    McDonald was decisively involved in the recommendation by Sevenson to the ACE to award the subcontract for soil transportation and disposal to BEI.

141.    The RFP for OU1 Phase II soil transportation and disposal was issued on or about March 4, 2002.

142.    Proposals in response to the Phase II RFP, including one from BEI dated May 21, 2002, were evaluated under McDonald's supervision.

143.    The BEI proposal dated May 21, 2002 stated prices for  the transportation and disposal of soil, but omitted to state that the prices included BEI's cost of making unauthorized payments to McDonald through GMEC.

144.    Sevenson relied upon the BEI proposal and McDonald's evaluation in making its decision to award BEI a subcontract for the transportation and disposal of soil.

145.    On or about June 12, 2002, McDonald, acting as Sevenson's project manager at the Federal Creosote Project, requested consent from the ACE to award the Phase II subcontract to BEI as the lowest and best-value offeror.

146.     On or about June 12, 2002, McDonald notified BEI that it would be awarded the subcontract for Phase II soil transportation and disposal at the Federal Creosote Site.

147.     On or about June 13, 2002, Griffiths signed Purchase Order No. ("PO #") G1669012 for the transportation and disposal of 23,090 tons of soil at $498.50 per ton unit price for a total price of $11,510,365.00.

148.     The next day, the BEI Defendants arranged for the first of the BEI Payments ($58,735.00 on June 14, 2002) to be paid to McDonald's affiliate GMEC.

149.     Upon information and belief, Griffiths arranged for BEI's payment to GMEC on or about June 14, 2002.  Upon information and belief, Bennett approved the payment.

150.     Upon information and belief, as part of the scheme, McDonald prepared false invoices for GMEC which were sent to BEI and processed for payment upon the approval of Bennett and Griffiths.

151.     As part of the scheme, GMEC invoices were sent to BEI to the attention of Griffiths at BEI's offices in Oakville, Ontario, Canada.  The GMEC invoices described services encompassing statistical field sampling, independent data validation and review, full metals data review, delivery, and similar services, but no such services were rendered.

152.     The GMEC office listed on the invoices was in Berlin, New Jersey at the home address of McDonald's brother, Thomas McDonald.  Payment was indicated by GMEC to be made by wire transfer.

153.    Griffiths approved the GMEC invoices for payment by BEI, but Bennett was also involved in the approval of each payment.

154.    Griffiths traveled to the Federal Creosote Site in New Jersey regularly in furtherance of the scheme to defraud Sevenson.  Upon information and belief, Bennett also traveled to the Federal Creosote Site in New Jersey for purposes of the scheme.

155.    By way of example and not limitation, McDonald sent GMEC invoice number 2060335 to BEI dated June 17, 2003 for services in the amount of $248,235.00, with a delivery charge of $1,675.00, for a total price of $249,910.00, which invoice was approved for payment on August 21, 2003.  Payment in the amount of $249,910.00 was made on August 26, 2003.

156.    On or about July 8, 2002, PO # G1669012 was replaced by PO # G1669023 in like amount but with a 15% variance for tonnage.

157.    BEI made additional unauthorized payments to McDonald as BEI performed under its Phase II subcontract with Sevenson as follows:

   a.   McDonald had ultimate responsibility and control of BEI's transportation and disposal of soil at the Federal Creosote Site;

   b.   BEI transported and disposed of the soil and invoiced Sevenson;

   c.   Sevenson paid BEI's invoices; and

   d.   GMEC presented false invoices to BEI which were paid upon the approval of Bennett and Griffiths.

158.    The invoices rendered to Sevenson for the Phase II transportation and disposal of soil were fraudulent as they failed to mention that they included the money BEI would pay to McDonald through GMEC.

159.    Sevenson relied upon the BEI invoices and paid them to BEI.  By way of example and not limitation, two payments on such invoices were made on August 1, 2002 ($300,210.00 and $15,223.95), and a BEI Payment was made to GMEC on August 19, 2002 ($33,150.00).

160.    McDonald used his position as Sevenson's project manager to facilitate BEI's subcontract work and recommended to Sevenson that change orders extend BEI's performance under PO # G1669023.

161.    As a result of the change orders, BEI performed substantially more work under its Phase II subcontract than Sevenson solicited under the Phase II RFP, 23,090 tons versus 65,486 tons.

162.    A change order for PO # G1669023 was made on or about November 18, 2002 to add 10,000 tons for a total price of $4,185,000.00 based on a survey administered under McDonald's supervision and without competing proposals.

163.    One week later, on or about November 25, 2002, BEI paid GMEC $41,395.00.

164.    Further change orders to PO # G1669023 were issued on February 11, 2003 and April 2, 2003, both for 10,000 tons and both in the amount of $4,185,000.00, following each of which BEI made unauthorized payments to GMEC: $84,215.00 on March 3, 2003 and $75,890.00 on April 16, 2003.

31

165.    The change orders prepared by McDonald for BEI omitted to disclose that they included the amount of  unauthorized payments to be paid to McDonald - McDonald and BEI concealed that fact from Sevenson.

166.    Sevenson relied on the change orders, and the invoices submitted pursuant to them, and paid BEI accordingly.

167.    On or about March 11, 2003, McDonald prepared and Sevenson issued an RFP for Phase III soil transportation and disposal.

168.    Proposals in response to the Phase III RFP were evaluated initially under McDonald's supervision in April, 2003.

169.    On or about May 7, 2003, McDonald requested consent from the ACE to award the subcontract for Phase III soil transportation and disposal to BEI as the lowest and best-value offeror.

170.    On or about June 2, 2003, BEI was informed that it would be awarded the subcontract for Phase III soil transportation and disposal at the Federal Creosote Site.

171.    Just days after this notification, the BEI Defendants arranged another of the BEI Payments ($177,000.00 on June 11, 2003) to be paid to McDonald by BEI.

172.    BEI made more unauthorized payments to McDonald through GMEC as it performed under its Phase III subcontract with Sevenson.

173.    From time to time, as part of his bargain with Griffiths and possibly others of the BEI Defendants, McDonald paid money to DCP.  The following payments were made on or about the following dates:

| Date | Amount |
|------|--------|
| 2/5/2003 | $28,500.00 |
| 3/17/2003 | $42,075.00 |
| 8/21/2003 | $28,880.00 |
| 9/15/2003 | $27,645.00 |
| 12/4/2003 | $38,900.00 |
| 2/25/2004 | $38,225.00 |
| 8/28/2004 | $3,391.00 |
| **TOTAL** | **$207,616.00.00** |

174.    Griffiths regularly engaged in wire communications with McDonald while McDonald was in New Jersey in furtherance of the scheme and provided information to McDonald in New Jersey for the wiring or other transmittal of funds out of GMEC's New Jersey bank account to DCP.

175.    Notwithstanding his status as Sevenson's fiduciary, McDonald fraudulently concealed from Sevenson and/or made misrepresentations to Sevenson concerning the BEI Payments solicited and accepted as set forth above.

176.    Sevenson reasonably relied upon the misrepresentations and omissions by McDonald and the BEI Defendants.

177.    The fraud of McDonald and the BEI Defendants has caused substantial damages to Sevenson.

**WHEREFORE**, Sevenson demands judgment against the BEI Defendants, jointly and severally, for fraud.

**Sixth Count**
**Against Defendants Ray Angelini,**
**Tranchina, Angelini (the "Angelini Defendants") and McDonald**
(Fraud)

178.     Plaintiff repeats and realleges all of the above allegations.

179.     Notwithstanding his status as Sevenson's fiduciary, McDonald and the Angelini Defendants fraudulently concealed from and made misrepresentations to Sevenson concerning the secret Angelini Payments solicited and accepted from Angelini and paid to GMEC.

180.     McDonald and the Angelini Defendants entered into a scheme whereby, in return for favorable treatment, Angelini would and did pay money to GMEC for work it did not perform at the Diamond Alkali Site and at the Federal Creosote Site.  The scheme among them included the following:

   a.   McDonald would assist in securing subcontracts for Angelini;

   b.   Angelini would include an amount for unauthorized payments to McDonald in its bids or proposals for work;

   c.   Angelini would submit invoices to Sevenson which included the unauthorized payment amount;

   d.   McDonald would assist, as necessary, in securing payment of the Angelini invoices which included the unauthorized payments;

   e.   Angelini would submit invoices to Sevenson which were inflated by virtue of the unauthorized payment scheme;

   f.   McDonald would submit invoices from GMEC to Angelini for work GMEC did not perform;

   g.   Angelini would pay the GMEC invoices; and

h.  McDonald would give favorable treatment to Angelini at the work sites, and assist in securing change orders for Angelini from time to time.

181.  Tranchina and McDonald conferred together in putting together the scheme to defraud described above, and Ray Angelini approved of it.

182.  Sevenson relied upon the misrepresentations and omissions of the Angelini Defendants and McDonald.

183.  The fraud of the Angelini Defendants and McDonald has caused substantial damages to Sevenson.

**WHEREFORE**, Sevenson demands judgment against these defendants, jointly and severally, for their fraud.

### Seventh Count
### Against JMJ, Drimak (the "JMJ Defendants") and McDonald
(Fraud)

184.  Plaintiff repeats and realleges all of the above allegations.

185.  Notwithstanding his status as Sevenson's fiduciary, McDonald fraudulently concealed from Sevenson and made misrepresentations to Sevenson concerning the secret JMJ Payments solicited and accepted from JMJ as set forth above.

186.  JMJ, which had a duty of good faith in its contractual dealings with Sevenson, likewise misrepresented and concealed information concerning the JMJ Payments from Sevenson.

187.  McDonald and the JMJ Defendants entered into a scheme whereby in return for favorable treatment, the JMJ Defendants paid money to GMEC for work it

did not perform at the Diamond Alkali Site and at the Federal Creosote Site.  The

scheme among them included the following:

a. McDonald would assist in securing subcontracts for JMJ;

b. JMJ would include a price for unauthorized payments in its bids or proposals for work;

c. JMJ would submit invoices to Sevenson which included the unauthorized payment price;

d. McDonald would assist, as necessary, in securing payment of the JMJ invoices which included the unauthorized payments;

e. JMJ would disguise the unauthorized payments in its invoices by including the price in other work that JMJ was doing;

f. McDonald would submit invoices from GMEC to JMJ for work GMEC did not perform;

g. JMJ would pay the GMEC invoices;

h. McDonald would give favorable treatment to JMJ at the work sites, and assist in securing change orders for JMJ from time to time.

188.    Drimak and McDonald conferred together in putting together the

scheme to defraud described above.

189.    Sevenson relied upon the misrepresentations and omissions by the

JMJ Defendants and McDonald.

190.    The fraud of the JMJ Defendants and McDonald caused substantial

damages to Sevenson.

**WHEREFORE**, Sevenson demands Judgment against these defendants, jointly

and severally, for fraud.

### Eighth Count
### Against Defendant Landgraber, Elite
### (the "Elite Defendants") and McDonald
(Fraud)

191.   Plaintiff repeats and realleges all of the above allegations.

192.   Notwithstanding his status as Sevenson's fiduciary, McDonald and the Elite Defendants fraudulently concealed from Sevenson and made misrepresentations to Sevenson concerning the secret Elite Payments solicited and accepted from Elite as set forth above.

193.   McDonald and the Elite Defendants entered into a scheme whereby in return for favorable treatment, the Elite Defendants would and did make unauthorized payments to GMEC for work it did not perform at the Diamond Alkali Site and at the Federal Creosote Site.  The scheme among them included the following:

a.   McDonald would assist in securing subcontracts for Elite;

b.   Elite would include a price for unauthorized payments in its bids or proposals for work;

c.   Elite would submit invoices to Sevenson which included the unauthorized payment price;

d.   McDonald would assist, as necessary, in securing payment of the Elite invoices which included the unauthorized payments;

e.   Elite would disguise the unauthorized payment in its invoices by including the price in other work that Elite was doing;

f.   McDonald would submit invoices from GMEC to Elite for work which GMEC did not perform;

g.   Elite would pay the GMEC invoices;  and

h.  McDonald would give favorable treatment to Elite at the work sites, and assist in securing change orders for Elite from time to time.

194.    Landgraber and McDonald conferred together in putting together the scheme to defraud described above.

195.    Sevenson relied upon the misrepresentations and omissions of the Elite Defendants and McDonald.

196.    The fraud by the Elite Defendants and McDonald has caused substantial damages to Sevenson.

**WHEREFORE**, Sevenson demands Judgment against these defendants, jointly and severally, for fraud.

### Ninth Count
### Against Defendants Boski, NIS
### (the "NIS Defendants") and McDonald
(Fraud)

197.    Plaintiff repeats and realleges all of the above allegations.

198.    Notwithstanding his status as Sevenson's fiduciary, McDonald and the NIS Defendants fraudulently concealed from Sevenson and made misrepresentations to Sevenson concerning the secret NIS Payments solicited and accepted from NIS as set forth above.

199.    McDonald and the NIS Defendants, prior to or during NIS's work at the Diamond Alkali Site and at the Federal Creosote  Site, agreed to the following terms:

a.  McDonald would assist in securing work for NIS;

    b.  NIS would submit invoices to Sevenson which included a price for unauthorized payments to McDonald;

    c.  McDonald would assist, as necessary, in securing payment of the NIS invoices which included the unauthorized payments;

    d.  NIS would disguise the unauthorized payments in its invoices to Sevenson by including them in other work that NIS was doing;

    e.  McDonald would submit invoices from GMEC to NIS for work which GMEC did not perform; and

    f.  NIS would pay the GMEC invoices.

    200.    Boski and McDonald conferred together in putting together the scheme to defraud described above.

    201.    Sevenson reasonably relied upon the misrepresentations and omissions of the NIS Defendants and McDonald.

    202.    The fraud of the NIS Defendants and McDonald has caused substantial damages to Sevenson.

    **WHEREFORE**, Sevenson demands Judgment against these defendants, jointly and severally, for fraud.

### Tenth Count
**Against McDonald, Patricia McDonald,**
**Matthew McDonald, Kevin McDonald and Thomas McDonald**
(Aiding and Abetting Breach of Fiduciary Duty)

    203.    Plaintiff repeats and realleges all of the above allegations.

    204.    Defendants knew of the fiduciary relationship between Sevenson and McDonald; still, defendants participated in the breach of McDonald's fiduciary

duty to Sevenson and aided and abetted him in the course thereof and were unjustly enriched as a result.

205.     The concerted action among the defendants caused substantial damages to Sevenson.

**WHEREFORE**, Sevenson demands Judgment against these defendants for their aid and abetting of the breach of fiduciary duty by McDonald.

### <u>Eleventh Count</u>
**Against the BEI Defendants**
(Aiding and Abetting Breach of Fiduciary Duty)

206.     Plaintiff repeats and realleges all of the above allegations.

207.     The BEI Defendants knew of the fiduciary relationship between Sevenson and McDonald.

208.     Still, the BEI Defendants participated in the breach of McDonald's fiduciary duty to Sevenson by tendering unauthorized payments to McDonald.

209.     The BEI Defendants paid or arranged for the payment of the BEI Payments to McDonald for the assistance of McDonald in obtaining approval by Sevenson of its proposals, bids and performance.

210.     In addition, Griffiths furnished McDonald with a series of gifts to obtain favorable treatment of BEI's proposals, bids and performance, including cases of wine, wine coolers, plasma television sets, medicine, and other gifts.  Griffiths included these expenses in submissions to BEI, and Bennett approved them.

211.     Bennett and Griffiths also directly arranged and approved payment of the BEI Payments to McDonald.

212.     After obtaining the proposals or bids, McDonald thereafter treated BEI more favorably than was in the best interest of Sevenson.

213.     The BEI Defendants aided and abetted McDonald by invading Sevenson's right to undivided loyalty from McDonald, its fiduciary and agent, which resulted in secret payments to McDonald in the course thereof and by which McDonald was unjustly enriched.

214.     In return, McDonald paid money to DCP through the efforts of Griffiths as consideration for arranging the scheme by which DCP and Griffiths and possibly others were unjustly enriched.

215.     The concerted action among the BEI Defendants caused substantial damages to Sevenson.

**WHEREFORE**, Sevenson demands judgment against the BEI Defendants, jointly and severally, for their aiding and abetting of the breach of fiduciary duty by McDonald.

<u>**Twelfth Count**</u>
**Against the JMJ Defendants**
(Aiding and Abetting Breach of Fiduciary Duty)

216.     Plaintiff repeats and realleges all of the above allegations.

217.     The JMJ Defendants knew of the fiduciary relationship between Sevenson and McDonald.

218.     Still, the JMJ Defendants participated in the breach of McDonald's fiduciary duty to Sevenson by tendering unauthorized payments to McDonald.

219.     The JMJ Defendants aided and abetted McDonald by invading Sevenson's right to undivided loyalty from McDonald, its fiduciary and agent, which resulted in secret unauthorized payments to McDonald in the course thereof, and they were unjustly enriched as a result.

220.     The concerted action by the JMJ Defendants caused substantial damages to Sevenson.

**WHEREFORE**, Sevenson demands Judgment against the JMJ Defendants, jointly and severally, for their aiding and abetting of the breach of fiduciary duty by McDonald.

### Thirteenth Count
**Against the Angelini Defendants**
(Aiding and Abetting Breach of Fiduciary Duty)

221.     Plaintiff repeats and realleges all of the above allegations.

222.     The Angelini Defendants knew of the fiduciary relationship between Sevenson and McDonald.

223.     Still, the Angelini Defendants participated in the breach of McDonald's fiduciary duty to Sevenson by tendering unauthorized payments to McDonald.

224.     The Angelini Defendants aided and abetted McDonald's breach of fiduciary duty by invading Sevenson's right to undivided loyalty from McDonald, its

fiduciary and agent, which resulted in secret unauthorized payments to McDonald in the course thereof, and they were unjustly enriched as a result.

225.    The concerted action among these defendants caused substantial damages to Sevenson.

**WHEREFORE**, Sevenson demands Judgment against the Angelini Defendants, jointly and severally, for their aiding and abetting of the breach of fiduciary duty by McDonald.

<u>**Fourteenth Count**</u>
**Against the Elite Defendants**
(Aiding and Abetting Breach of Fiduciary Duty)

226.    Plaintiff repeats and realleges all of the above allegations.

227.    The Elite Defendants knew of the fiduciary relationship between Sevenson and McDonald.

228.    Still, the Elite Defendants participated in the breach of McDonald's fiduciary duty to Sevenson by tendering the unauthorized payments to McDonald.

229.    The Elite Defendants aided and abetted McDonald's breach of fiduciary duty by invading Sevenson's right to undivided loyalty from McDonald, its fiduciary and agent, which resulted in secret unauthorized payments to McDonald in the course thereof and they were unjustly enriched as a result.

230.    The concerted action among these defendants caused substantial damages to Sevenson.

**WHEREFORE**, Sevenson demands Judgment against the Elite Defendants, jointly and severally, for their aiding and abetting of the breach of fiduciary duty by McDonald.

## Fifteenth Count
### Against the NIS Defendants
(Aiding and Abetting Breach of Fiduciary Duty)

231.    Plaintiff repeats and realleges all of the above allegations.

232.    The NSI Defendants knew of the fiduciary relationship between Sevenson and McDonald.

233.    Still, the NIS Defendants participated in the breach of McDonald's fiduciary duty to Sevenson by tendering the NIS Payments to McDonald.

234.    The NIS Defendants aided and abetted McDonald's breach of fiduciary duty by invading Sevenson's right to undivided loyalty from McDonald, its fiduciary and agent, which resulted in secret unauthorized payments to McDonald in the course thereof, and they were unjustly enriched as a result.

235.    The concerted action among these defendants caused substantial damages to Sevenson.

**WHEREFORE**, Sevenson demands Judgment against the NIS Defendants, jointly and severally, for their aiding and abetting of the breach of fiduciary duty by McDonald.

**Sixteenth Count**
**Against Defendant BEI**
(Breach of Contract)

236.    Plaintiff repeats and realleges all of the above allegations.

237.    BEI broke its subcontracts with Sevenson by paying money to GMEC, the McDonald Entities, McDonald or other McDonald affiliates.

**WHEREFORE**, Sevenson demands Judgment against BEI for breach of contract in an amount to be determined at trial, but not less than the amount of the BEI Payments, with interest thereon from the date of breach.

**Seventeenth Count**
**Against Angelini**
(Breach of Contract)

238.    Plaintiff repeats and realleges all of the above allegations.

239.    Angelini broke its subcontracts with Sevenson by paying money to GMEC, the McDonald Entities, McDonald or other McDonald affiliates.

**WHEREFORE**, Sevenson demands Judgment against the Angelini for breach of contract in an amount to be determined at trial, but not less than the amount of the Angelini Payments, with interest thereon from the date of breach.

**Eighteenth Count**
**Against JMJ**
(Breach of Contract)

240.    Plaintiff repeats and realleges all of the above allegations.

241.    JMJ broke its subcontracts with Sevenson by paying money to GMEC, the McDonald Entities, McDonald or other McDonald affiliates.

**WHEREFORE**, Sevenson demands Judgment against JMJ for breach of contract in an amount to be determined at trial, but not less than the amount of the JMJ Payments, with interest thereon from the date of breach.

**Nineteenth Count**
**Against Elite**
(Breach of Contract)

242.    Plaintiff repeats and realleges all of the above allegations.

243.    Elite broke its subcontracts with Sevenson by paying money to GMEC, the McDonald Entities, McDonald or other McDonald affiliates.

**WHEREFORE**, Sevenson demands Judgment against Elite for breach of contract in an amount to be determined at trial, but not less than the amount of the Elite Payments, with interest thereon from the date of breach.

**Twentieth Count**
**Against NIS**
(Breach of Contract)

244.    Plaintiff repeats and realleges all of the above allegations.

245.    NIS broke its subcontracts with Sevenson by paying money to GMEC, the McDonald Entities, McDonald or other McDonald affiliates.

**WHEREFORE**, Sevenson demands Judgment against the NIS for breach of contract in an amount to be determined at trial, but not less than the amount of the NIS Payments, with interest thereon from the date of breach.

**Twenty-first Count**
**Against All Defendants**
(Civil Conspiracy)

246.    Plaintiff repeats and realleges all of the above allegations.

247.    At all relevant times, the scope and nature of a common plan to defraud Sevenson was known to all defendants and defendants knowingly participated in that common plan at Sevenson's expense.

248.    Among other things, defendants conspired together to solicit, to provide and to accept money without Sevenson's knowledge, consent or benefit.

**WHEREFORE**, Sevenson demands Judgment against all of the defendants, jointly and severally, for having been engaged in a civil conspiracy involving the breach of fiduciary duty by McDonald to their benefit, as well as to the defrauding of the plaintiff.

**Twenty-Second Count**
**Against Thomas McDonald, McDonald, Patricia McDonald,**
**Kevin McDonald, Matthew McDonald, FBS and DCP**
(Unjust Enrichment)

249.    Plaintiff repeats and realleges all of the above allegations.

250.    Defendants Thomas McDonald, McDonald, Patricia McDonald,

Kevin McDonald, Matthew McDonald, FBS and DCP procured benefits from Sevenson

through fraud and breach of fiduciary duty as described above.

251.    Sevenson did not gratuitously provide the benefit to  these

defendants and received no benefit therefrom.

252.    The benefit is measurable.

253.    These defendants consciously accepted the benefits.

**WHEREFORE**, Sevenson demands Judgment for unjust enrichment against these

defendants.

**Twenty-Third Count**
**Against McDonald And Patricia McDonald**
(Constructive Trust)

254.    Plaintiff repeats and realleges all of the above allegations.

255.    In or about June 2003, McDonald requested that Sevenson loan

money to himself and Patricia McDonald for the purchase of an interest in the Sea Isle

Property.

48

256.    Because McDonald was a trusted and dependable employee, or so it thought at the time, Sevenson made a bridge loan of $146,915.48 to McDonald and Patricia McDonald on or about June 10, 2003.

257.    On or about June 11, 2003, McDonald received a BEI Payment of $177,000.00; a few days later, on or about June 17, 2003, McDonald transferred $165,000.00 of that payment to Patricia McDonald and himself.

258.    On or about June 20, 2007, Patricia McDonald and McDonald used the funds and the Sevenson bridge loan to purchase an interest in the Sea Isle Property.

259.    On or about August 26, 2003, McDonald received one of the BEI Payments in the amount of $249,910.00 into a GMEC bank account.

260.    On or about September 8, 2003, McDonald repaid the bridge loan to Sevenson from the GMEC bank account, thus using more unauthorized payments to finance Patricia McDonald's and McDonald's interest in the Sea Isle Property.

261.    From time to time, McDonald and Patricia McDonald used money in or from the GMEC account to improve and furnish the Sea Isle Property.

262.    McDonald and Patricia McDonald committed wrongful acts through fraud and breaches of fiduciary duty and purchased or improved the Sea Isle Property with Sevenson's funds.

263.    McDonald and Patricia McDonald have been unjustly enriched by the diversion of funds in which Sevenson has an interest to the purchase or improvement of the Sea Isle Property.

264.    Sevenson is entitled to a declaration that it has an interest in the Sea Isle Property, which was purchased, improved and furnished with plaintiff's funds.

**WHEREFORE**, Sevenson demands Judgment impressing a constructive trust upon the Sea Isle Property and for title to the Sea Isle Property to be quieted for the benefit of Sevenson, or so much of it as will prevent the unjust enrichment of McDonald and Patricia McDonald.

**<u>Twenty-Fourth Count</u>**
**Against Defendant Thomas McDonald**
(Aiding and Abetting Fraud)

265.    Plaintiff repeats and realleges all of the above allegations.

266.    Thomas McDonald aided and abetted McDonald in his scheme to defraud Sevenson by, among other things, authorizing McDonald to use his home address as the business address of GMEC for the purpose of McDonald's receipt of the unauthorized payments and to disguise McDonald's frauds, as well as knowingly receiving mail and other communications concerning the unauthorized payments and furnishing them to McDonald, in return for which Thomas McDonald received proceeds from the unauthorized payments.

267.    Thomas McDonald was aware of McDonald's fraudulent scheme, as well as his role as part of the wrongful activity, at the time he allowed his address to be used, received and furnished communications, and received a portion of the unauthorized payments.

268.    Thomas McDonald therefore knowingly and substantially aided and abetted the fraud perpetrated by McDonald and others, causing Sevenson to suffer injury.

**WHEREFORE**, Sevenson demands Judgment against Thomas McDonald for aiding and abetting fraud.

_____

Plaintiff Sevenson Environmental Services, Inc. further demands

Judgment against the defendants as aforesaid and including:

    a.        Punitive damages for the tortious acts of the defendants;

    b.        Attorneys fees, as provided by rule or law; and

    c.        Such other relief as the court deems just and proper.

**TRIAL BY JURY IS DEMANDED**


PHELAN, PETTIT & BIEDRZYCKI, LLC
CHRISTOPHER H. JONES, ESQUIRE
CHAD MOUNTAIN, ESQUIRE
Attorney I.D. Nos.: 32872/68389
121 South Broad Street
Suite 1600
Philadelphia, PA 19107
(215) 546-0500
(215) 546-9444 (Fax)
cjones@pp-b.com
Attorneys for Sevenson Environmental
Services, Inc.


PHILLIPS LYTLE LLP


       */s/ Minryu Kim*
MINRYU KIM, ESQUIRE
Attorney I.D. No.: 025822006
Suite 3400
One HSBC Center
Buffalo, New York  14203-2887
Telephone No. (716) 847-8400
mkim@phillipslytle.com
Attorneys for Sevenson Environmental
Services, Inc.


DATED:      October 8, 2008

Doc # 01-2248838.1