**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC., | |
| Plaintiff, | Civil No. 08-1386 |
| v. | **OPINION** |
| DIVERSIFIED ROYALTY CORP., et al., | |
| Defendants. | |

APPERANCES:


PHILLIPS LYTLE LLP
By:  Alan J. Bozer, Esq.
     Erin C. Borek, Esq.
One Canalside
125 Main Street
Buffalo, New York 14203
          Counsel for Plaintiff


DLA PIPER LLP (US)
By:  Christopher M. Strongosky, Esq.
     John Vukelj, Esq.
     James V. Noblett, Esq.
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey 07078
          Counsel for Defendant Diversified Royalty Corp.

**BUMB, UNITED STATES DISTRICT JUDGE:**

This matter comes before the Court upon the Motions for Summary Judgment filed by Plaintiff Sevenson Environmental Services, Inc. and Defendant Diversified Royalty Corp.[1] For the reasons stated herein, Sevenson's motion will be granted in part and denied in part, and Diversified's motion will be denied.

## I. <u>Facts</u>

Plaintiff Sevenson provides environmental clean-up and site remediation services. At all relevant times, Defendant Diversified was Sevenson's subcontractor at the Federal Creosote site. Federal Creosote was an EPA designated Superfund site occupying 53 acres in Manville, New Jersey. (Sevenson's Responsive Rule 56.1 Statement, Dkt. 416-1, ¶ 1) In the late 1990s, the EPA contracted with the U.S. Army Corp of Engineers to oversee remediation of the site. (Id. ¶ 3) The Army Corp, in turn, hired Sevenson as its prime contractor. (Id. ¶ 4) On January 28, 2000, the Army Corp and Sevenson executed the Preplaced Remedial Action Contract ("PRAC"). (McDermott Aff., Dkt 402-1, Ex. 1) The PRAC, in a section entitled "Antikickback Procedures," states:

---

[1] Sevenson has also filed a Motion for Summary Judgment against Defendant Gordon McDonald. Opposition to that motion has not been filed. The Court addresses that motion in a separate opinion and order.

(b) The Anti-Kickback Act of 1986 (41 U.S.C. 51-58) (the Act), prohibits any person from -

(1) Providing or attempting to provide or offering to provide any kickback;

(2) Soliciting, accepting, or attempting to accept any kickback; or

(3) Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor.

(c)(1) The Contractor shall have in place and follow reasonable procedures designed to prevent and detect possible violations described in paragraph (b) of this clause in its own operations and direct business relationships.

(2) When the Contractor has reasonable grounds to believe that a violation described in paragraph (b) of this clause may have occurred, the Contractor shall promptly report in writing the possible violation. Such reports shall be made to the inspector general of the contracting agency, the head of the contracting agency if the agency does not have an inspector general, or the Department of Justice.

(3) The Contractor shall cooperate fully with any Federal agency investigating a possible violation described in paragraph (b) of this clause.

(4) The Contracting Officer may (i) offset the amount of the kickback against any monies owed by the United States under the prime contract and/or (ii) direct that the Prime Contractor withhold, from sums owed a subcontractor under the prime contract, the amount of any kickback. The Contracting Officer may order the monies withheld under subdivision (c)(4)(ii) of this clause be paid over to the Government unless the Government has already offset those monies under subdivision (c)(4)(i) of this clause. In either case, the Prime Contractor shall notify the Contracting Officer when the monies are withheld.

(5) The Contractor agrees to incorporate the substance of this clause, including this subparagraph (c)(5) but excepting subparagraph (c)(1), in all subcontracts under this contract which exceed $100,000.

(McDermott Aff., Dkt 402-1, Ex. 1)

In April 2001, Sevenson selected BEI[2] as its subcontractor for Phase I soil remediation. (Dkt 416-1, ¶ 22) There are no allegations in this suit that anything tortious or illegal occurred during Phase I.

According to Diversified, the trouble began just before the competitive bidding process for Phase II remediation. In December 2001, BEI hosted "dozens of Sevenson employees and officers" at a National Hockey League game. (Dkt 416-1, ¶ 30) "BEI rented a suite at the arena, with catered food and an open bar." (Id. ¶ 31) Robert

---

[2] Bennett Environmental, Inc., "BEI", has since become Diversified. BEI and Diversified are used interchangeably throughout this opinion.

Griffiths, BEI's sales agent, helped organize the event. (Id. ¶ 32) Defendant Gordon McDonald also attended the event; at that time Sevenson was "in the process of assigning [McDonald] to be the new project manager at Federal Creosote." (Id. ¶ 35) BEI employees testified at their depositions that BEI hosted the hockey game "as an expression of thanks to Sevenson for" awarding BEI the Phase I contract, and in the "hop[e] that the hockey game would lead to more business at Federal Creosote." (Id. ¶¶ 37-38)

Not long thereafter, in February 2002, BEI, through Griffiths, purchased NBA All-Star Game tickets for Sevenson's President and CEO, Michael Elia. (Noblett Decl., Dkt No. 403-19, Ex. 16)

Also around this time, during the first quarter of 2002, BEI submitted its initial bid for Phase II. (Dkt 416-1, ¶ 42) BEI undisputedly was not the lowest bidder. (Id. ¶¶ 46-49) Griffiths testified at his deposition that McDonald told Griffiths that BEI was not the low bid on the second phase, and offered Griffiths "the 'last look' which would give [BEI] an opportunity to see all the competitors' prices . . . before submitting [BEI's] price in exchange for paying certain [expenses]." (Griffiths Dep. p. 89) McDonald also allegedly told Griffiths that there "could be" or "might be" an opportunity for BEI to "rebid" "based on th[e] new information." (Id. p. 161)[3]

_____

[3] Griffiths also testified that while at the Federal Creosote site, he overheard McDonald and Sevenson's Assistant Project Manager Norman

Phase II was ultimately re-bid, and BEI submitted the lowest bid, even though its new bid price was $13.50 per ton greater than its initial bid. (Dkt 416-1, ¶¶ 71-72)[4] BEI was awarded the Phase II subcontract. (Noblett Decl., Dkt 417-14, Ex. 12) Importantly, the Phase II subcontract between Sevenson and BEI specifies that BEI will dispose of the treated soil from the Federal Creosote site "in a Subtitle C or equivalent landfill." (Id.) It appears undisputed that the Phase II subcontract incorporates the anti-kickback provisions of the PRAC.[5]

Thereafter, McDonald and Griffiths met at a cocktail lounge and agreed to divide the extra $13.50 thusly: "(1) 50% to cover non-reimbursable expenses; (2) 30% for entertainment expenses for Sevenson's employees and executives; and (3) 20% to BEI." (Dkt 416-1, ¶ 73)

---

Stoerr discussing the fact that BEI was not the lowest bidder. (Griffith Dep. p. 160-61) Griffiths believed that McDonald and Stoerr wanted him to hear the conversation. (Id.)

[4] Griffiths testified at his deposition that he thinks McDonald manipulated soil samples in order to achieve this result. (Griffiths Dep. p. 162-63) Diversified also suggests that McDonald may have given misinformation concerning soil quantity to the other bidders.

[5] Both parties have submitted copies of the Phase II subcontract. (See Noblett Decl., Dkt 403-3, Ex. 19; McDermott Aff., Dkt 402-1, Ex. 7) Both copies are a single-sided copy of what appears to be at least a double-sided document. Specifically, the first page of the document states that "[t]his purchase order is subject to all the terms and conditions printed on the reverse side," yet the reverse side does not appear in the record before the Court.

While Phase II work was underway, "Griffiths arranged and paid for a [10-day] Mediterranean cruise for Sevenson's leadership." (Dkt 416-1, ¶ 79) Both Griffiths and McDonald, and their wives, among others, went on the cruise. (Id. ¶ 80)

Later, Sevenson conducted an internal investigation as to whether the trip violated anti-kickback laws. (Id. ¶ 90) "To avoid the appearance of impropriety, Sevenson decided that its executives would reimburse BEI for the cruise." (Id. ¶ 92) The executives wrote individual personal checks to BEI, but the record is unclear as to whether BEI ever cashed those checks. (Id. ¶ 94) The parties also dispute whether the personal checks covered the total cost of the trip. (Dkt 416-1, ¶ 93)

"After the cruise, senior management and employees of Sevenson continued requesting and accepting sporting event tickets and other gifts from BEI." (Dkt 416-1, ¶ 103)[6]

In November 2002, the EPA changed its rules such that the waste from the Federal Creosote site "could be disposed in a less expensive

---

[6] Diversified asserts that such tickets and other gifts included passes to a golf tournament, a hotel room in Montreal for the daughter of a Sevenson executive, concert tickets, tickets to the 2003 NCAA Men's College Basketball "Final Four," a bachelor party for a Sevenson project engineer working at the Federal Creosote site, and two additional cruises, among other things. (Dkt 416-1, ¶¶ 104-114) Sevenson disputes the particulars of some of these items-- for example, whether the golf passes were of substantial value-- and asserts that there is a fact issue as to "whether gifts purportedly for Sevenson's entertainment were legitimate or for [Griffiths'] personal use." (Id.)

Subtitle D or equivalent facility." (Dkt 416-1, ¶ 120)  Thereafter,
Sevenson and BEI executed a change order reducing the price BEI would
charge Sevenson for soil remediation to reflect the decreased cost of
disposal.  (Id. ¶ 121)

A complication arose, however, because BEI had stockpiled 21,003
tons of soil that it had removed from the Federal Creosote site
before the rule change. (Dkt 416-1, ¶¶ 124, 129)  After the rule
change, and after the change order was signed, BEI sent the
stockpiled soil to a less expensive site even though it had invoiced
Sevenson (and ultimately the EPA) at the higher Subtitle C rate that
was in effect at the time the soil was removed.  (Id. ¶ 130)  At some
point, McDonald learned that "BEI was paying a lower disposal cost
and therefore making additional profit because of the EPA's rule
change during Phase Two"[7] and "demanded additional payments from
BEI."  (Id. ¶ 133)

Several years later, in September 2006, the United States
Department of Justice "launched criminal and civil investigations . .
. into the activities of Sevenson, McDonald, and his co-conspirators
at Federal Creosote." (Dkt 416-1, ¶ 134)  As a result of the

---

[7]  The parties refer to this alleged scheme as "the Soil Switch."
The Court finds this term somewhat confusing insofar as the parties
do not dispute that the Federal Creosote soil itself was not actually
switched; rather, the same soil was sent to a different site.  Thus,
it would appear that the alleged scheme is more accurately described
as a "site switch."  Nonetheless, for consistency with the briefs,
the Court will use the term "Soil Switch."

investigation: (a) BEI pled guilty to criminal charges "agree[ing] to pay the EPA a fine of $1 million and restitution of $1,662,000.00" (Id. ¶ 141); (b) "Griffiths and Zul Tejpar, a former vice president at BEI, pleaded guilty to charges related to the bid-rigging conspiracy" at the Federal Creosote site (Id. ¶ 143); and (c) "BEI's former president, John Bennett, was found guilty of charges stemming from his participation in the bid-rigging." (Id. ¶ 145)

Employees on the Sevenson side of the transaction were also prosecuted. McDonald was convicted of bid-rigging at Federal Creosote (Dkt 416-1, ¶ 146), and Stoerr pled guilty to conspiring to rig bids and conspiring to solicit and accept kickbacks from subcontractors at the Federal Creosote site. (Noblett Decl., Dkt 403-3, Ex. 35)[8] Sevenson itself also settled civil claims the United States asserted against it in connection with the bid-rigging and kickback scheme at Federal Creosote, agreeing to pay $2,727,200.00. (Dkt 416-1, ¶ 156)[9]

Sevenson asserts the following claims against Diversified: fraud, aiding and abetting McDonald's breach of fiduciary duty, breach of contract, civil conspiracy, and unjust enrichment.

---

[8] Several other Sevenson executives pled guilty to tax charges which also resulted from the DOJ investigation, although the parties dispute whether these charges were related to the Federal Creosote site. (Dkt 416-1 ¶ 167)

[9] Those claims included, among others, violations of the False Claims Act, the Anti-Kickback Act, and breach of contract. (Noblett Decl., Dkt 403-3, Ex. 18)

Diversified asserts the following counterclaims against Sevenson:
aiding and abetting Griffiths' breach of fiduciary duty, breach of
contract, civil conspiracy, and unjust enrichment.

## II. **Summary Judgment Standard**

Summary judgment shall be granted if "the movant shows that
there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A
fact is "material" only if it might impact the "outcome of the suit
under the governing law." Gonzalez v. Sec'y of Dept of Homeland
Sec., 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if
the evidence would allow a reasonable jury to find for the nonmoving
party. Id.

In determining the existence of a genuine dispute of material
fact, a court's role is not to weigh the evidence; all reasonable
inferences and doubts should be resolved in favor of the nonmoving
party. Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 387 (3d
Cir. 2010). However, a mere "scintilla of evidence," without more,
will not give rise to a genuine dispute for trial. Saldana v. Kmart
Corp., 260 F.3d 228, 232 (3d Cir. 2001). Moreover, a court need not
adopt the version of facts asserted by the nonmoving party if those
facts are "utterly discredited by the record [so] that no reasonable
jury" could believe them. Scott v. Harris, 550 U.S. 372, 380 (2007).
In the face of such evidence, summary judgment is still appropriate
"where the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party." Walsh v. Krantz, 386 F. App'x 334, 338 (3d Cir. 2010).

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." Connection Training Servs. v. City of Phila., 358 F. App'x 315, 318 (3d Cir. 2009). "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." Id. In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord. Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC. v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment."). However, "the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial"; the evidence does not need to be in admissible form at the time of summary judgment. FOP v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016).

### III. **Analysis**

Sevenson has moved for summary judgment as to its breach of contract claim only, as well as all of Diversified's counterclaims. Diversified has moved for summary judgment as to all of Sevenson's claims.

(A)  Sevenson's Breach of Contract Claim

Sevenson asserts that Diversified breached the Phase II subcontract when it disposed of soil at a less expensive site but charged Sevenson Subtitle C prices, i.e., Sevenson's breach of contract claim is based on the alleged Soil Switch.

In support of its Motion for Summary Judgment, Diversified asserts three arguments: (1) the breach of contract claim is barred by the doctrine of in pari delicto[10]; (2) Sevenson suffered no damages because the EPA ultimately paid the alleged overcharges; and (3) the Soil Switch was not a breach of the Phase II subcontract.

First, Diversified asserts that all of Sevenson's claims, including the breach of contract claim, are barred by the doctrine of

---

[10]  Ryan v. Motor Credit Co., 130 N.J. Eq. 531, 549 (Ch. 1941) ("equity will not aid one party or another to an illegal transaction where they stand in pari delicto, but will leave them just where it finds them, to settle these questions without the aid of the court."); see generally, Pinter v. Dahl, 486 U.S. 622, 636 (1988) ("Plaintiffs who are truly in pari delicto are those who have themselves violated the law in cooperation with the defendant."); Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. PricewaterhouseCoopers, LLP, 2008 WL 3895559, at *5 (3d Cir. July 1, 2008) ("In pari delicto is a murky area of law. It is an ill-defined group of doctrines that prevents courts from becoming involved in disputes in which the adverse parties are equally at fault.").

in pari delicto. According to Diversified, McDonald's acts should be imputed to Sevenson, rendering Sevenson equally as culpable as BEI, and therefore in pari delicto should apply. Sevenson responds that, as to its Soil Switch breach of contract claim[11], McDonald's actions cannot be imputed to it and Sevenson's fault was not equal to BEI's.

With respect to the issue of imputation, the Court begins with the basic premise that "[i]n the corporate context, a manager's misconduct is usually imputed to the corporation." Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 405 (App. Div. 2011). An exception exists, though, where "the wrongs of an insider will not be imputed to the corporation if the insider acted solely for his own benefit and adverse to the interest of the corporation." Id. "[T]his is a fact-sensitive inquiry that may defeat a motion for summary judgment," as the factfinder may be required to determine

---

[11] The parties' briefs raise a question concerning the scope of the alleged illegal transaction upon which Diversified's in pari delicto defense is based upon. Sevenson asserts that the Court should conduct distinct inquiries as to imputation and relative fault with regard to the Phase II bid-rigging and the Soil Switch. Diversified, on the other hand, takes the position that the Phase II bid-rigging and the Soil Switch were all part-and-parcel of the prime contractor / sub-contractor relationship between BEI and Sevenson at the Federal Creosote Site, and so, according to Diversified, the Phase II bid-rigging / kickback scheme and the Soil Switch should not be "carv[ed] up . . . into distinct conspiracies" for purposes of the in pari delicto analysis. (Diversified's Reply Brief, Dkt 425, p. 6) In this regard, the Court finds it helpful to keep in mind that in pari delicto is an affirmative defense to a plaintiff's claim for relief. Thus, it must be the plaintiff's claim that defines the contours of the defense to said claim, and a claim-by-claim analysis is appropriate.

"whether any short-term or transient benefit to the corporation can be considered a benefit to the corporation." Id.; see also, NCP Litigation Trust v. KMPG LLP, 187 N.J. 353, 365-66 (2006) ("many courts have held that the applicability of the imputation defense to a particular case cannot be determined on a motion to dismiss or a motion for summary judgment."). Thus, McDonald's acts in allegedly keeping quiet about BEI's overcharges, and accepting a kickback out of the excess money BEI retained by disposing of soil in a less expensive facility, will be imputed to Sevenson unless Sevenson received no benefit from McDonald's actions. See Bondi, 423 N.J. Super. at 407 (stating that the legal standard is "no benefit accrued to the corporation . . . or that the benefit was so transitory as to be illusory."). While there is no evidence that the kickback money McDonald accepted made its way back to Sevenson, the absence of such evidence does not preclude a finding that Sevenson received some other benefit. Indeed, a reasonable juror could find that Sevenson benefitted from allowing BEI to continue performing the Phase II remediation work despite the overcharge associated with the Soil Switch. In particular, a jury could find that since the overcharge was ultimately passed on to the U.S. Government, Sevenson stood to gain by keeping the overcharges secret; doing so would avoid the disruption and delay associated with having to re-bid the Phase II site remediation in order to hire a new subcontractor. Thus, issues

of material fact exist as to whether Sevenson benefitted from McDonald's actions.

If a jury finds facts supporting imputation, the jury next will be required to consider whether Sevenson and Diversified have "substantially equal responsibility for the underlying illegality" of the Soil Switch. Bondi, 423 N.J. Super. at 407. Whether Sevenson or Diversified bears greater responsibility for the harm to the Government resulting from the overcharge and related kickbacks will require a particularly fact-specific balancing, rendering such a determination inappropriate for disposition on summary judgment. Cf. Scola v. Constantino Richards Rizzo, LLP, 2013 WL 1342292, at *3 (Mass. Super. Mar. 28, 2013) ("Questions about whether the parties are equally at fault, and what their relative capabilities, roles and knowledge were, are inherently fact-intensive."). In short, Sevenson's argument that "McDonald (or Sevenson), as the bribee cannot be held [equally as] responsible [as] BEI, the briber" (Opposition Brief, Dkt 416, p. 21), and Diversified's argument that "[a]s conspiring thieves do, BEI and Sevenson both ignored their legal obligations" (Reply Brief, Dkt. 425, p. 10) must be presented to a jury.

Second, Diversified argues that Sevenson suffered no damages from the Soil Switch because the EPA ultimately "funded the remediation efforts though its cost-reimburseable contract with Sevenson." (Moving Brief, Dkt 403-1, p. 26) Sevenson responds that

14

it "is entitled to the benefit of its bargain, separate from its contract with [the government]." (Opposition Brief, Dkt 416, p. 33) Sevenson asserts that the undisputed fact that Sevenson's payments to BEI pursuant to the Phase II subcontract were later reimbursed by the government pursuant to the PRAC does not support summary judgment in favor of Diversified.

The Restatement (Second) of Contracts § 346 supports Sevenson's position:

> (1) The injured party has a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged.
>
> (2) If the breach caused no loss or if the amount of the loss is not proved under the rules stated in this Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal damages.

Both New York and New Jersey[12] follow this rule. <u>See</u> <u>Supreme Showroom, Inc. v. Branded Apparel Grp. LLC</u>, 2018 WL 3148357, at *15 (S.D.N.Y. June 27, 2018) ("Branded need not prove actual damages to succeed on its breach of contract claim. New York law provides that nominal damages are always available in a breach of contract suit."); <u>Nappe v. Anschelewitz, Barr, Ansell & Bonello</u>, 97 N.J. 37, 46 (1984) ("The general rule is that whenever there is a breach of contract, or an invasion of a legal right, the law ordinarily infers that damage

---

[12] Sevenson asserts that New York law applies to the contract claims in this suit. Diversified takes the position that New York and New Jersey law do not materially differ.

ensued, and, in the absence of actual damages, the law vindicates the right by awarding nominal damages.")[13]; see also, Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co., 988 F.2d 386, 409 (3d Cir. 1993) (discussing "the general proposition that a breach of contract without pecuniary harm entitles the non-breaching party to no more than nominal damages"; citing Restatement (Second) of Contracts § 346(2)). Thus, the Court holds that Diversified's "no damages" argument does not support granting summary judgment to Diversified as to Sevenson's breach of contract claim.

Third, Diversified argues that the Soil Switch was not a breach of the Phase II subcontract. It asserts that the subcontract "set a firm fixed price of $498.50 and had no provision requiring BEI to lower its price based on BEI's own cost savings after the EPA changed the soil disposal rules. Absent a contractual provision requiring BEI to share that extra profit with Sevenson-- an arm's length commercial counterparty-- there was no breach of contract." (Moving Brief, Dkt 403-1, p. 28)

---

[13] Nappe similarly defeats Diversified's "no damages" argument as it relates to Sevenson's other tort claims. In Nappe, the New Jersey Supreme Court held "that compensatory damages are not an essential element of an intentional tort committed wilfully and without justification when there is some loss, detriment or injury, and that nominal damages may be awarded in such cases in the absence of compensatory damages." 97 N.J. at 48. The Court simultaneously reaffirmed that "[i]t is well established that the plaintiff must show a breach of duty and resulting damage to prevail in a negligence action." Id. at 48 (italics in original).

Sevenson responds very simply that: (1) the "Subcontract required Subtitle C Disposal;" (2) "BEI billed Sevenson for 21,003 tons of Subtitle C Disposal and Sevenson paid for the same; yet (3) "BEI did not" dispose of the soil in a Subtitle C facility. (Dkt 416, p. 36; see also Dkt 424, p. 5)[14] The undisputed fact that federal law allowed for non-Subtitle C disposal is irrelevant to the breach of contract analysis, which focuses on the terms of the parties' agreement.[15] Accordingly, Diversified's Motion for Summary Judgment as to Sevenson's breach of contract claims will be denied.

(B) <u>Diversified's Breach of Contract Counterclaim</u>

---

[14] As discussed at length in Sevenson's moving brief (Dkt 402-31, p. 11-13) and Diversified's opposition brief (Dkt 417, p. 19-22), the record evidence is unclear as to where the 21,003 tons of soil was actually disposed. There is evidence that some or all of the soil may have been disposed of in a Subtitle D facility, some or all may have been disposed of in an embankment, and some or all may have been disposed of in a sand pit. (Sevenson's Moving Brief, Dkt 402-31, p. 12-13)

[15] In a related argument, Diversified asserts that Sevenson cannot recover restitution damages as a matter of law because disposal of the soil in a non-Subtitle C facility was not a material breach of the Phase II subcontract insofar as such disposal did not "destroy the essential object of the contract." (Opposition Brief, p. 18) First, it does not appear that Sevenson seeks to recover restitution damages. Sevenson's Motion for Summary Judgment on its own breach of contract claim appears to seek traditional "benefit of the bargain" expectation damages. (<u>See</u> Moving Brief, Dkt 402-31, p. 1, "[Sevenson's] damages are the difference between what Sevenson paid for Subtitle C Disposal, and the value of what it received.")
    Second, the record evidence suggests that Subtitle C disposal was an essential term of the parties' agreement insofar as Sevenson's contract with the Army Corp of Engineers required Subtitle C disposal. (McDermott Aff., Dkt 402-1, ¶¶ 7, 14)

17

Diversified asserts that Sevenson breached the Phase II subcontract when Sevenson employees McDonald and Stoerr accepted kickbacks from Griffiths and "Sevenson's executives and management team received cruises, tickets to sporting and concert events and other lavish gifts." (Diversified's Opposition Brief, Dkt 417, p. 26) Sevenson moves for summary judgment arguing that the claim is based "solely on the imputation of McDonald's conduct to Sevenson" and that McDonald's conduct cannot be imputed. (Reply Brief, Dkt 424, p. 13) This argument fails for two reasons.

First, Diversified clearly states that its claim is not based solely on McDonald's conduct; in addition to McDonald's conduct, Diversified asserts that Sevenson breached the subcontract when Stoerr accepted kickbacks and Sevenson executives accepted large gifts from Griffiths. Sevenson has not addressed this separate (albeit factually intertwined) theory of liability, and that omission alone would be sufficient to deny Sevenson's motion for summary judgment on Diversified's counterclaim.

Secondly, however, issues of disputed material fact exist as to whether McDonald's conduct can be imputed to Sevenson. As set forth above, McDonald's actions will be imputed to Sevenson unless "no benefit accrued to the corporation . . . or that the benefit was so transitory as to be illusory." Bondi, 423 N.J. Super. at 407.

The summary judgment record suggests that Sevenson may have received a benefit from McDonald's actions. The terms of the kick-

back scheme are undisputed: McDonald and Griffiths agreed to divide the extra $13.50 in the following manner: "(1) 50% to cover non-reimbursable expenses; (2) 30% for entertainment expenses for Sevenson's employees and executives; and (3) 20% to BEI." (Dkt 416-1, ¶ 73) A reasonable factfinder could find that some portion of the "50% of non-reimbursable expenses" went to Sevenson, rather than McDonald personally. If a jury were to so find, such finding would undermine Sevenson's assertion that McDonald acted "entirely in [his own] self-interest." (Opposition Brief, Dkt 416, p. 22) Accordingly, summary judgment will be denied as to Diversified's breach of contract counterclaim against Sevenson.

(C)   <u>Sevenson's Remaining Tort Claims against Diversified</u>

Diversified moves for summary judgment as to Sevenson's claims for fraud and unjust enrichment asserting that there is no record evidence to support these claims. In opposition, Sevenson points to record evidence in support of its claims. Diversified makes no specific argument in reply, rather, it falls back on its two umbrella arguments that Sevenson is in pari delicto and that Sevenson has suffered no damages. However, the Court has already addressed why those two arguments do not support summary judgment for Diversified. Accordingly, summary judgment will also be denied as to Sevenson's fraud and unjust enrichment claims.[16]

---

[16] Diversified also argues that Sevenson's civil conspiracy cannot survive because Diversified is entitled to summary judgment on all of

(D)  <u>Diversified's Aiding and Abetting Breach of Fiduciary Duty</u>
     <u>Counterclaim</u>

Diversified asserts that Sevenson aided and abetted Griffiths'
breach of fiduciary duty to BEI.  Sevenson responds that this claim
fails as a matter of law because the undisputed evidence demonstrates
that Griffiths did not breach his duty to BEI insofar as Griffiths
and BEI both intended to pay kickbacks.  Sevenson observes that BEI
admitted as much when it pled guilty to a federal criminal
information charging that "BEI provided the kickbacks to [McDonald]
and other employees of [Sevenson] who were co-conspirators in order
to influence and reward them for the award of sub-contracts to BEI at
Federal Creosote" (Bozer Decl. Ex. H, Dkt 402-22, at ¶ 15), and
cannot argue otherwise here.  Sevenson does not address this argument
and so the Court considers the point conceded.  Summary judgment will
be granted to Sevenson on Diversified's counterclaim that Sevenson
aided and abetted Griffiths' breach of fiduciary duty to BEI.

(E)  <u>Diversified's Unjust Enrichment Counterclaim</u>

Sevenson moves for summary judgment as to Diversified's claim
that Sevenson was unjustly enriched by receiving lavish compensation
from Griffiths in the form of expensive gifts and entertainment.
Sevenson argues that Diversified's breach of contract claim is based

_____

the underlying claims.  However, as discussed herein, the Court
concludes that summary judgment is not warranted on any of Sevenson's
claims, and therefore summary judgment is also not warranted on the
civil conspiracy claim.

on the same alleged wrong, and therefore the unjust enrichment claim must be dismissed.

Diversified responds that its unjust enrichment claim "is not predicated on a breach of contract," rather, "Diversified asserts that Sevenson was unjustly enriched because Sevenson procured benefits from BEI by aiding and abetting the breach of Griffiths' fiduciary duty to BEI." (Opposition Brief, Dkt 417, p. 27) As discussed above, the aiding and abetting claim fails, therefore the unjust enrichment claim also fails. Summary judgment will be granted to Sevenson on Diversified's unjust enrichment claim.[17]

## IV.  __Conclusion__

For the forgoing reasons, Diversified's Motion for Summary Judgment will be denied in its entirety, and Sevenson's Motion for Summary Judgment will be granted as to Diversified's aiding and abetting, unjust enrichment, and civil conspiracy counterclaims, and denied in all other respects.

As the Court has repeatedly observed over the decade-long life-span of this litigation, and as should be eminently clear from the summary judgment record, neither party comes to this suit with clean hands.  The parties are now left with the choice to incur the time

---

[17]  None of Diversified's tort claims remain, therefore summary judgment is also warranted on Diversified's civil conspiracy claim. As Diversified acknowledges in its brief, such a claim requires and underlying tort.  (Opposition Brief, Dkt 417, p. 25, citing Bd. of Ed., Asbury Park v. Hoek, 38 N.J. 213, 238 (1962)).

and expense associated with asking a jury to determine-- if it can--
whose hands are dirtier.  In the Court's view, however, both parties
do so at the risk that the jury will conclude that neither party is
entitled to compensation for any of the claims asserted in this suit.


October 16, 2018                    _ s/ Renée Marie Bumb _____
                                    RENÉE MARIE BUMB
                                    UNITED STATES DISTRICT JUDGE