IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> DIVERSIFIED ROYALTY CORP., et al., <br><br> Defendants. | Civil No. 08-1386 <br><br> **OPINION** |

APPERANCES:

PHILLIPS LYTLE LLP
By: Alan J. Bozer, Esq.
    Erin C. Borek, Esq.
One Canalside
125 Main Street
Buffalo, New York 14203
            Counsel for Plaintiff

GORDON MCDONALD, *pro se*
B.O.P. Register # 30211-050
Lexington Federal Medical Center
P.O. Box 14500
Lexington, Kentucky 40512


**BUMB, UNITED STATES DISTRICT JUDGE**:

   This matter comes before the Court upon the Motion for Summary

Judgment filed by Plaintiff Sevenson Environmental Services, Inc.

against its former employee, Defendant Gordon McDonald.[1] McDonald has not filed opposition to the motion. For the reasons set forth herein, the motion will be granted.

I. **Facts**[2]

Plaintiff Sevenson provides environmental clean-up and site remediation services. (McDermott Aff., Dkt No. 401-9, ¶ 4) McDonald was employed by Sevenson from 1996 through late 2007. (Id. ¶ 5) During that time, McDonald served as a project manager for Sevenson at two New Jersey sites which are relevant to the instant motion: the Diamond Alkali Site and the Federal Creosote Site. (Id.)

Sevenson alleges that, in the course of his employment, McDonald stole from it in at least five different ways. First, while working at the Diamond Alkali site, McDonald, in his capacity as project manager, received a $28,576.98 check for payment on an invoice Sevenson had issued to Tierra Solutions. (McDermott Aff., Dkt No. 401-9, ¶¶ 8-9) The check was drafted as payable to Sevenson. (Id. ¶ 7) McDonald deposited the check "into the bank account of his shell company GMEC, Inc." (Id.) "McDonald was not authorized to take the

---

[1] Sevenson has also filed a Motion for Partial Summary Judgment against Defendant Diversified Royalty Corp. and Diversified has filed a Motion for Summary Judgment against Sevenson. The Court addresses those motions in a separate opinion and order.

[2] As stated previously, McDonald has filed no opposition to the instant motion. The Court's statement of facts is taken from the record evidence submitted by Sevenson, and Sevenson's Statement of Material Facts Not in Dispute, which facts are deemed undisputed for the purposes of the motion, pursuant to L. Civ. R. 56.1(a).

2

check for his personal benefit." (Id. ¶ 8) "McDonald [did not] inform Sevenson that he had received the funds." (Id. ¶ 11) Instead, "McDonald told his supervisors that the customer had adamantly refused to pay the invoice in question and that in the interest of maintaining good relations with that customer the invoice should be written off, which it was." (Id. ¶ 12)

Second, after learning of the alleged conversion of the Tierra Solutions check, Sevenson conducted an audit of field accounts, whereupon it was discovered that on other occasions, "McDonald wrote checks from Sevenson's field accounts (primarily at the Diamond Alkali Site) to certain payee 'entities' and individuals which investigation has found to be either (a) fictitious or (b) affiliated with McDonald." (McDermott Aff., Dkt No. 401-9, ¶ 14-15) Specifically, the audit revealed 99 "irregular checks issued out of Sevenson's funds in the Diamond Alkalai Site field account" over the course of 1999 through 2006, totaling $193,836.58. (Id., Ex. 2) After a review of records, Sevenson has concluded that "no services or materials were received" for any of the 99 checks identified on Exhibit 2. (McDermott Aff. ¶ 16)

Third, "McDonald also periodically withdrew from Sevenson's field account certain monies intended for per diem cash payments to job site employees. McDonald was found to have been withdrawing more cash than needed to pay per diems and concealing that fact by entering false (i.e., higher) totals in the weekly record of per

3

diems paid, improperly keeping excess funds for himself." (McDermott Aff. ¶ 26) Sevenson's audit revealed that those excess funds totaled $23,640.00. (Id. ¶ 27 and Ex. 3)

Fourth, over the course of 2002 to 2007, McDonald wrote 35 checks either to himself, or to cash, and deposited the total amount-- $41,599.77-- into the account of his shell company, GMEC. (McDermott Aff. ¶ 28-29 and Ex. 4)

Fifth, Sevenson has found other checks drawn on the field account which were payable to, and apparently cashed by, existing businesses but were not payments for any Sevenson expense. For example, Sevenson discovered "checks to RAC Marine for repairs to a pleasure boat owned by McDonald, and not owned by Sevenson." (McDermott Aff. ¶ 31) Sevenson has concluded that the "total thus converted [in this manner] was $51,297.24." (Id. and Ex. 5)[3]

All of these asserted thefts, however, were not "discovered [until] after McDonald was terminated from his employment with Sevenson." (McDermott Aff. ¶¶ 8, 15) McDonald was officially "fired on October 18, 2007," however, he had been suspended without pay beginning on September 30, 2007 because he "was absent from work in August and through the last part of September, 2007." (Id. ¶¶ 44, 85)

---

[3] In addition to these alleged thefts, as set forth in some detail in the Court's accompanying Opinion addressing Sevenson's and Diversified's motions for summary judgment, the record evidence supports a finding that McDonald also participated in two kickback schemes in connection with the Federal Creosote site. Sevenson has determined that those kickbacks paid to McDonald totaled at least $1,114,240.00. (McDermott Aff. ¶¶ 38-39)

4

During the time of McDonald's suspension, McDonald was "unresponsive" to Sevenson's attempts to communicate with him. (Id. ¶¶ 44-45)[4] On October 12, 2007-- six days before McDonald was fired, and while McDonald was still suspended-- "Sevenson learned that McDonald had received illegal kickbacks from BEI." (Id. ¶ 47) "Sevenson fired McDonald because he stopped coming to work, and because he was discovered to have taken kickbacks from BEI." (Id. ¶ 43)

From March 2000 through October 2007, Sevenson paid McDonald compensation-- in the form of a salary, bonuses, pension and profit sharing contributions-- totaling $1,088,086.41. (McDermott Aff. ¶ 36-37)

Sevenson moves for summary judgment as to the following claims against McDonald: (1) conversion of the Tierra Solutions check; and (2) breach of fiduciary duty.

Sevenson also moves for summary judgment as to McDonald's counterclaims against it, which are (1) wrongful termination in violation of New Jersey's Conscientious Employee Protection Act, "CEPA," and (2) violation of the New Jersey Wage Payment Law.

---

[4] By August 2007, it appeared that McDonald could be in legal jeopardy. "The U.S. Department of Justice (DOJ) first subpoenaed Sevenson in September 2006." (McDermott Aff. ¶ 66) McDonald assisted in collecting records responsive to that subpoena. (Id. ¶ 67) Sevenson also interviewed McDonald in October 2006 and December 2006. The DOJ interviewed McDonald in June 2007. (Id. ¶¶ 74-75) In August 2007, Sevenson told McDonald that he should retain counsel in connection with the DOJ's investigation. (Id. ¶¶ 76-78) Indeed, McDonald was eventually tried and convicted of federal criminal charges, and is currently serving his sentence in a federal correctional facility.

5

**II. Summary Judgment Standard**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id. "[W]hen a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (citing Fed. R. Civ. P. 56(e)). In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord., Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.")). Failure to sustain this burden will result in entry of judgment for the moving party.

The same basic legal analysis applies when a summary judgment motion is unopposed, Anchorage Associates v. Virgin Islands Board of Tax Review, 922 F.2d 168 (3d Cir. 1990), however, the material facts

6

put forth by the movant are deemed undisputed pursuant to L. Civ. R. 56.1(a) ("any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.").

**III. Analysis**

A. Conversion of the Tierra Solutions check

Conversion is "the exercise of any act of dominion in denial of another's title to the chattels, or inconsistent with such title." Mueller v. Tech. Devices Corp., 8 N.J. 201, 207 (1951). "To constitute a conversion of goods there must be some repudiation by the defendant of the owner's right, or some exercise of dominion over them by him inconsistent with such right, or some act done which has the effect of destroying or changing the quality of the chattel." Id.[5]

Sevenson's evidence (which is unrebutted by McDonald since he has filed no opposition) establishes that by taking the Tierra Solutions check made payable to Sevenson, and depositing it in GMEC's account, McDonald exercised control over the check in a manner inconsistent with Sevenson's right to the money. That is, in the normal course, the Tierra Solutions check would have been deposited in an account belonging to Sevenson, not McDonald.

---

[5] See generally, Restatement (Second) of Torts § 231(1) ("one who, as agent or servant, receives the possession of a chattel on behalf of his principal or master in consummation of a transaction negotiated by the actor for the purpose of giving a proprietary interest in the chattel to the principal or master, is subject to liability for a conversion to another who is entitled to the immediate possession of the chattel.").

7

Accordingly, summary judgment will be granted to Sevenson on the conversion claim.

B. <u>Breach of fiduciary duty to Sevenson</u>

Sevenson contends that McDonald, as Sevenson's project manager, owed it fiduciary duties of honesty, fair dealing, and loyalty, and that McDonald breached those duties by stealing from Sevenson and by taking kickbacks. According to Sevenson, McDonald's breaches were so egregious that the equitable remedy of wage disgorgement is warranted.

"Loyalty from an employee to an employer consists of certain very basic and common sense obligations. An employee must not[,] while employed[,] act contrary to the employer's interest." <u>Kaye v. Rosefielde</u>, 223 N.J. 218, 229 (2015). Certainly such "basic and common sense obligations" include the duty to refrain from repeatedly stealing from the employer over the course of several years. <u>See also</u>, <u>id.</u> at 230 ("an employee's self-dealing may breach [the] duty [of loyalty]."). Thus, the record evidence demonstrates that McDonald breached his fiduciary duty when he committed thefts from Sevenson.[6]

---

[6] Sevenson argues that McDonald's participation in the two kickback schemes at the Federal Creosote site were additional breaches of fiduciary duty. The Court need not rule on this particular argument because the Court holds that the thefts are independently sufficient to establish the breach of fiduciary duty claim, and the equitable remedy of compensation disgorgement. However, the Court notes that Sevenson's argument that the kickback schemes violated McDonald's fiduciary duties, which implies that McDonald acted "contrary to [Sevenson's] interest," <u>Kaye</u>, 223 N.J. at 229, is not necessarily

8

Further, "if the employee breaches the duty of loyalty at the heart of the employment relationship, he or she may be compelled to forego the compensation earned during the period of disloyalty. The remedy is substantially rooted in the notion that compensation during a period in which the employee is disloyal is, in effect, unearned." Kaye, 223 N.J. at 233. The New Jersey Supreme Court has instructed,

> [i]n this and other matters in which the trial court finds a breach of the duty of loyalty, the trial court should consider the following factors when considering whether disgorgement is an appropriate remedy: the employee's degree of responsibility and level of compensation, the number of acts of disloyalty, the extent to which those acts placed the employer's business in jeopardy, and the degree of planning to undermine the employer that is undertaken by the employee.

Id. at 237.

Sevenson's evidence more than sufficiently establishes many of these factors. First, the record establishes that McDonald was a supervisory employee in which Sevenson entrusted great responsibility; he was the project manager at more than one hazardous waste site, including one federal Superfund site. (McDermott Aff. ¶ 5) The project manager "ha[s] access to and control over the mail"

---

inconsistent with the Court's holding in the accompanying opinion addressing Sevenson and Diversified's summary judgment motions that, for the purposes of the in pari delicto analysis, a factfinder could find that Sevenson benefitted from the kickback schemes. A reasonable factfinder could find that the kickback scheme was contrary to Sevenson's long-term interest, thereby supporting the breach of fiduciary duty claim, while simultaneously finding that Sevenson did receive a more than an illusory short term benefit from the kickback schemes, thereby supporting the imputation prong of the in pari delicto analysis.

9

at the site he manages, "assures that payments are properly deposited into corporate accounts," and "control[s] the field account to cover expenses up to $5,000.00." (Id. ¶¶ 9, 14, 17)

Second, McDonald was very well compensated, earning a salary ranging from $97,342.45 in 2006 to $203,617.40 in 2002. (McDermott Aff. ¶ 36)

Third, McDonald was repeatedly disloyal over the span of at least seven years. The evidence of the 99 irregular checks McDonald wrote on the Diamond Alkalai field account is just a fraction of the disloyal acts established by Sevenson's evidence. (McDermott Aff. Ex. 2)

Fourth, the record discloses that the thefts caused financial losses to Sevenson of $338,950.57, which must have adversely affected Sevenson's business. (McDermott Aff. ¶¶ 7, 17, 27, 29, 32)

Fifth, the record evidence demonstrating that McDonald used a shell company to accomplish some of his thefts (McDermott Aff. ¶ 7), as well as the other steps McDonald took to hide his thefts-- including falsifying business records (Id. ¶¶ 12, 13, 18)-- establishes that McDonald extensively planned the acts that breached his duty to Sevenson.

Accordingly, Sevenson's Motion for Summary Judgment as to the breach of fiduciary duty claim, and the attendant claim for equitable disgorgement of compensation, will be granted.

C. <u>CEPA and Wage Payment counterclaims</u>

McDonald has the burden of proof as to these claims.  He has filed no opposition to Sevenson's instant motion, and therefore McDonald has put forth no evidence supporting his claims.  This failure is fatal to his claims.  Orsatti, 71 F.3d at 484 ("In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he must point to concrete evidence in the record; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment.").

Accordingly, Sevenson's Motion for Summary Judgment will be granted as to McDonald's counterclaims.

## IV. Conclusion

For the forgoing reasons, Sevenson's Motion for Summary Judgment will be granted.  An order on the motion, as well as a judgment for Sevenson in the amount of $1,116,663.39, which is the amount of the converted Tierra Solutions check plus the compensation Sevenson paid McDonald from March 2000 through October 2007, will be entered.


October 16, 2018                      _ s/ Renée Marie Bumb _____
                                      RENÉE MARIE BUMB
                                      UNITED STATES DISTRICT JUDGE